Jackie McBRAYER, Appellant,

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Appellee.**

No. 1022, Docket 82–6150.

United States Court of Appeals, Second Circuit.

Argued March 25, 1983.

Decided July 8, 1983.

Charles S. Barquist, Parker Auspitz Neesemann & Delehanty P.C., New York City (Claudia J. Flynn, New York City, of counsel), for appellant.

Beryl R. Jones, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Miles M. Tepper, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before OAKES, CARDAMONE and WINTER, Circuit Judges.

OAKES, Circuit Judge:

This appeal is from an order of the United States District Court for the Eastern District of New York, Eugene H. Nickerson, Judge, granting judgment on the pleadings to the Secretary of Health and Human Services. The Secretary denied the application of Jackie McBrayer for disability benefits sought under the Federal Coal Mine Health and Safety Act, 30 U.S.C. §§ 903–45 (1976 & Supp. V 1981), as the disabled child of a miner deceased from Black Lung disease. The Secretary determined that McBrayer was not disabled before the age of twenty-two and therefore that McBrayer was ineligible for disabled child benefits, 30 U.S.C. §§ 902(g), 922(a)(3); 42 U.S.C. §§ 402(d)(1)(B)(ii), 416(h)(2), (3), 423(d) (1976 & Supp. V 1981).

McBrayer applied for these benefits based on his status as the surviving child of a coal miner who died of black lung disease. See 30 U.S.C. § 922(a)(3) (Supp. V 1981). Section 922(a)(3) refers to the definition of "child" contained in section 902(g). Section 902(g), as amended in 1972, defines "child" as a child or stepchild who is unmarried and either a student, under 18, or "under a disability as defined in section 423(d) of Title 42." 42 U.S.C. § 423(d) defines "disability" as "inability to engage in any substantial gainful activity by reason of any ... physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). Section 423(d)(4), however, "establishes a different test of

[substantial gainful activity] for blind persons than is applied administratively for persons with other disabilities." H.Rep.No. 95–702 Part II, 95th Cong., 1st Sess. 73, *reprinted in* 1977 U.S.Code Cong. & Ad. News 4155, 4291, 4319. It provides that "[n]o individual who is blind shall be regarded as having demonstrated an ability to engage in substantial gainful activity on the basis of earnings that do not exceed the exempt amount [for retired persons]." 42 U.S.C. § 423(d)(4). Even though the opening line of section 416(i)(1) states that its definition of disability applies "[e]xcept for purposes of ... [section] 423 ... of this title," section 423(d)(4) by its own terms requires us to refer to the section 416(i)(1) definition of blindness before we can apply the section 423(d)(4) definition of substantial gainful activity. *See also* § 423(d)(1)(B) ("in the case of an individual who ... is blind (within the meaning of "blindness" as defined in section 416(i)(1) of this title)"). "Blindness" means "central visual acuity of 20/200 or less in the better eye with the use of a correcting lens," 42 U.S.C. § 416(i)(1)(B), though limitation in the fields of vision so that the visual field at its widest diameter is no more than 20° also constitutes blindness, *id.*[1] Thus, the Secretary is required to decide if McBrayer was blind before he turned twenty-two and, if so, whether this prevented him from engaging in substantial gainful activity as defined in sections 423(d)(1)(A) and 423(d)(4). We reverse the Secretary as to the finding of blindness and remand the issue of substantial gainful activity.

## I. *Blindness*

The administrative record clearly establishes that McBrayer suffered from congenital cataracts and nystagmus since his birth in November of 1929 and that his vision has always been impaired as a result. It is also clear, however, that his eye condition has deteriorated over his lifetime and, while his current condition is disabling, the ALJ found that it was not disabling prior to November, 1951, when McBrayer was twenty-two years old.[2] Section 423(d)(3) further provides that physical impairment must be demonstrable by medically acceptable clinical and laboratory diagnostic techniques. The only expert evidence bearing on the question whether McBrayer was blind before he was twenty-two is the medical report of Dr. Jacob J. Stam in September 1974. Dr. Stam, an ophthalmological consultant of the Secretary and a board-qualified specialist, found McBrayer's vision, with correction, to consist of only "light perception" in his right eye and to be 20/400 in his left eye. The doctor concluded that "at age 18 it is most probable that the best vision with lenses was approximately the same as on this exam today. This patient has been legally blind since birth."

According to McBrayer's own testimony he did not learn Braille although he was advised to do so in early childhood. Even though he could read and write, he was not able to see the blackboard. An elementary school teacher told him his vision was 20/200. In high school he could apparently read out of his right eye, but he could not engage in extracurricular activities because of his vision. He did concede that "at one point congenital cataracts are not as opaque as they are at other points," and that he could read "heavy print" but his teachers made his assignments for him that he could read. His memory aided his school work, so that he was able to attend a junior college which he finished when he was twenty-two, and read a certain amount. His first job, doing packing work, did not require reading except for the large-numbered bills of lading. His subsequent work in a restaurant was counter work, although he did have to write out checks on occasion. His previously filed disability applications indicate he became disabled in 1964 or 1965, when he

1. Under New York law an individual is legally blind if his vision is no better than 20/200 with correction. N.Y.Unconsol.Laws § 8704(b) (McKinney 1974).

2. While there are doubts as to McBrayer's birthdate, the ALJ concluded that he was born on November 7, 1929. Thus the critical date for disability purposes becomes November 7, 1951.

was thirty-five or thirty-six. It is on the strength of his schooling, his work, and his previous disability applications that the ALJ found that Dr. Stam's report was to be disregarded.

But McBrayer was unwilling as a young man to concede that he was blind, and even now he fights against it. The medical record is clear that he has had congenital cataracts which were misdiagnosed as simple nearsightedness in his childhood. To read at all, he had to hold the paper close to his right eye, the less impaired one. His employers thought his work was inferior because of his eyesight and this handicapped his chances to advance from menial jobs. The earliest medical records, made in December 1952 at Columbia Presbyterian Hospital when McBrayer was admitted for treatment of respiratory infection at age twenty-three, less than thirteen months after the critical date for present purposes, note that McBrayer had congenital cataracts in both eyes, that his left cataract had been at least partially removed, and that all or part of his left iris had been surgically removed several years before. It was also reported that his fundi—the part of his eye opposite the pupil—could not be visualized and that he had pain with dull light, occasional double vision, blurring coupled with inflammation, and that his eyes moved abnormally and involuntarily from side to side. He had an eye consultation during his hospitalization, and the examiner felt that "further surgery for his congenital cataracts will probably [not?][3] be rewarding but that extraction of his right lens could be done if the patient desires."

A subsequent ophthalmological report dated March 27, 1968, states "congenital cataracts since birth, but misdiagnosed as myopia. Surgery . . . at Manhattan Eye &

Ear—at age 16. Vision not much better after surgery." As best as we can read the figures, they show that his vision was 20/200 in both eyes but under certain tests one eye was at 20/300. As of December 18, 1968, he was classified blind by the New York State Commission, and surgery on his right eye was recommended in January, 1969. Evidently the cataract was extracted on May 8, 1969, but the lens of his right eye has shown degenerative changes.

The Secretary could properly find that McBrayer's vision deteriorated from 1952 to 1979 not only from the evidence above recounted, which shows that McBrayer could read even as late as 1951 when he attended college, but from his own indications in applications for benefits that he became unable to work in "1964 possible 1965," that his congenital cataracts became "more opaque" in 1963 and that he "left his job as his vision deteriorated and he could not do the work," having "difficulty reading labels and the mailing scales."[4] But deterioration as such is irrelevant if McBrayer was legally disabled in 1951, and nothing in the record suggests that he was not, as reported in no uncertain terms by Dr. Stam. We reverse because the Secretary disqualified McBrayer on the ground that McBrayer was not blind before 1951, a finding that is unsupported by substantial evidence.

■ Substantial evidence is that quantum of "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir.1981). Though we must credit an ALJ's findings if supported by substantial evidence, we retain a responsibility to conduct a searching inquiry

---

3. This word is illegible in copies of the medical report supplied by counsel, but the negative reading makes more sense.

4. The statements by McBrayer in previous applications for disability are not substantial evidence that he did not qualify for benefits. The forms were filled out by representatives of the Social Security Administration—McBrayer could not even read the answers he was signing

—and, even if they accurately reflect the answers he gave to SSA questions, they are explicable in light of his psychological unwillingness to admit disability or his confusion, shared with the Secretary, as to the distinction between legal blindness and inability to perform a sufficient quantity of tasks as to be unemployable.

and to scrutinize the entire record, having in mind that the Social Security Act (as well as the Coal Mine Health and Safety Act) is remedial in purpose. *Id.* Under these standards, the ALJ simply had no evidence to find that appellant did not meet criteria for statutory blindness in 1951 even though his vision continued to deteriorate into the 1960s, after he became twenty-two. Dr. Stam's report, as substantiated by the Columbia Presbyterian records, stands unchallenged except by the ALJ's own inference to the contrary. But the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. *Grable v. Secretary of HEW,* 442 F.Supp. 465, 470 (W.D. N.Y.1977). As stated by the Third Circuit, "[w]hile an administrative law judge is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who testified before him." *Gober v. Matthews,* 574 F.2d 772, 777 (3d Cir. 1978); *see also Dousewicz v. Harris,* 646 F.2d at 774 (diagnosis proper though made several years after actual onset of impairment).

## II. *Substantial Gainful Activity*

[2] Having established that McBrayer was blind does not establish that he was disabled unless as a result of his impairment he was unable to engage in substantial gainful activity, 42 U.S.C. § 423(d)(1)(A), which permitted him to earn in excess of the exempt amount specified by 42 U.S.C. § 423(d)(4). Unfortunately, the exempt amount referred to by section 423(d)(4), set out in 403(f)(8)(D), only covers earnings in years as early as 1977, while McBrayer's relevant earnings could start as early as 1929 and he had no recorded *actual* earnings until 1951. We have no difficulty in finding that McBrayer is included in the groups covered by the exempt amount provision: even though the 1977 amendment begins to apply only in taxable year 1977, McBrayer's putative *entitlement* to Black Lung Benefits did not begin until May, 1978, when his mother died, even though his disability may have commenced in 1929, when he was born. Because Congress in-

tended to extend special aid to blind persons eligible for benefits in 1977 and thereafter, it is proper to apply the modified substantial gainful activity standard to those blind persons who became eligible after 1977 no matter when they became blind or "disabled." Though it is easy for us to say that McBrayer is entitled to benefits if his earnings were less than the exempt amount under 423(d)(4), it is another matter—an entirely factual one—to determine whether McBrayer's earnings exceeded the section 423(d)(4) amount. Three factors in particular confound a simple comparison of McBrayer's reported earnings with the § 423(d)(4) amount. First, the exempt amounts are monthly, and McBrayer's earnings reported in the record on appeal are annual. Second, section 423(d)(4) requires to be excluded from the individual's earnings amounts equal to the cost of attendant services, drugs, equipment, etc., which were necessary for the applicant's employment and no attempt has been made to estimate these. Third, we cannot, within the reasonable confines of judicial notice, calculate the value of McBrayer's earnings in any year after 1950. Each of these three factors should be considered by the Secretary on remand.

Judgment reversed in part and remanded for further findings.