Nadine M. MINSKY, Plaintiff,

v.

Kenneth S. APFEL, Acting Commissioner of Social Security, Defendant.

No. CV98–2460–ADS.

United States District Court, E.D. New York.

Sept. 17, 1999.

Wendy Brill, New York City, for Plaintiff Nadine M. Minsky.

Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, NY by Claire S. Kedeshian, Assistant United States Attorney, for Defendant Commissioner of Social Security.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

The plaintiff, Nadine M. Minsky ("Minsky" or the "plaintiff"), commenced this action pursuant to the Social Security Act, 42 U.S.C. § 405(g)(the "Act"), seeking review of a final administrative determination of the Commissioner of the Social Security Administration (the "Commissioner"), denying her application for Social Security Disability Insurance Benefits. At issue are the parties' cross-motions for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c).

This case is notable in that it involves the ALJ's rejection of a finding of disability by all four of Minsky's treating physicians. With regard to three of the four treating doctors, the ALJ rejected their opinions, in large measure, on his perception that these licensed physicians practiced "outside the mainstream of medicine" and used unconventional methods of treatment. The ALJ rejected the opinion of the fourth treating physician on the theory that his views were "unsupported" and "contradicted" by his contemporaneous notes, even though this physician clearly operated "within the mainstream" of medicine, a fact evidenced by his impressive résumé: a Clinical Professor of Medicine at New York University School of Medicine; the Medical Director at Lenox Hill Hospital in Manhattan; the Chief of Rheumatology at Lenox Hill Hospital; and formerly the Chief of Lupus Erythematosus and Related Diseases at Bellevue Hospital in Manhattan. Surprisingly, the Commissioner never had the plaintiff examined by a Social Security consulting physician, and therefore there were no contrary opinions offered from a single examining doctor.

## I. BACKGROUND

### A. Procedural History

On October 28, 1994, Minsky filed an application for Social Security Disability Insurance benefits. Her application was denied, both initially and on reconsideration. Minsky's request for an administrative hearing was granted. The hearing was held on June 5, 1996 before an Administrative Law Judge (the "ALJ"). The plaintiff and her attorney attended the hearing, at which a medical advisor and a vocational expert testified on behalf of the Commissioner. The ALJ found that the plaintiff was not disabled because she was able to perform light work subject to certain non-exertional limitations prior to December 31, 1994, the date when her insured status expired. On February 5, 1998, the Appeals Council denied the plaintiff's request for review. This action followed.

The sole issue before the Court is the Commissioner's finding that Minsky was not disabled between May 15, 1994, her alleged onset date, through December 31, 1994, when her insured status expired. Although Minsky originally stated that her impairment was lupus, at the hearing, Minsky and her attorney claimed that her sole medically-determinable impairment was mixed connective tissue disease. Minsky and her counsel conceded that she did not ever meet the diagnostic criteria for any particular specific connective tissue disease, such as lupus. Connective tissue disease is a group of diseases including rheumatoid arthritis, systemic lupus erythematosus, rheumatic fever, scleroderma

and others, that are sometimes referred to as rheumatic diseases. Mixed connective tissue disease is a syndrome with overlapping clinical features of systemic lupus erythematosus, scleroderma, polymyositis, and Raynaud's phenomenon.

The plaintiff states in an affirmation that her condition went into remission in March 1997 and she was able to work after that time. Therefore, the plaintiff seeks only a brief and closed period of disability.

## B. The Plaintiff's Testimony at the Hearing

Minsky testified that she was 47 years old at the time of the hearing held on June 5, 1996.

### 1. Minsky's Testimony Regarding Her Work History

Between 1980 and 1987, Minsky, who has three years of college education, worked for Dunn & Bradstreet doing outside sales of credit contracts. From 1988 to 1993, she operated a small show and boarding kennel. She stopped when she sold her home, where the kennel was located. Beginning in February 1993, Minsky began working at what eventually became a full-care animal facility. In October 1993, she became a partner in the business with its original owner. She used to work about 60 hours a week. The business operated 24 hours a day, seven days a week, and required that Minsky live on the premises. Minsky testified that she last worked full-time there in May 1994, at or about the time of her alleged onset date.

### 2. Minsky's Testimony Regarding Her Medical Condition

Minsky testified that she first became sick in May 1994. She felt exhausted, had a rash on her face, and could not concentrate. She experienced pain in her back and muscles. She had no energy, and was short of breath all the time, even without exertion. In addition, she developed a rash on her face, and her eyes felt tired. Her lower back started to hurt, and she noticed swelling of her ankles, hands, and the side and back of her neck, along with headaches. The plaintiff testified that her level of pain varied, with the worst being in her back at a level of "more than moderate" 50% of the time. She also experienced problems with balance, and fell down approximately 10 times. In addition, she experienced hair loss, frequent and severe colds, coughs, and sore throats. She had difficulty sleeping, and was only able to do so with the aid of medication. Even with medication, however, she was only able to sleep for a few hours.

Minsky's usual weight before her illness was 130 pounds. After she got sick, her weight at one point increased to 218 pounds. At the hearing, she weighed 190 pounds.

According to the plaintiff, after May 1994, on some days she worked an hour or two a day, some days she spent in bed, and approximately six days a months she would have a "great" day and be able to work three to four hours. Her symptoms gradually worsened.

According to the plaintiff, she was at her worst from May 1994 to October 1994. From January 1995 through August 1995, she was in bed most of the time, and she felt better in September 1995 through October 1995, but in November 1995 again felt worse, although not as badly as she felt the prior year. Minksy testified that on some days, she could not get out of bed because her vision would "be blurry and my back would be killing me and I just, I just couldn't function. And, I'd sleep the entire day."

Minsky told the ALJ that on good days, she can sit for a half an hour before her back starts to hurt and she becomes stiff on trying to stand. On bad days, she cannot do any sitting at all. She finds it difficult to hold a pen because she cannot grasp, and at best can do so only for 10 minutes. She can lift about 5 or 6 pounds, at most. During periods of slight improvement, Minsky could walk a half a block to the store. At best, she could concentrate

on a computer for 10 to 15 minutes; at worst, she could not concentrate at all. On a good day, Minsky could stand for 10 minutes, but on a bad day, only for 30 seconds. On the bad days, she usually stayed in bed. Most of her days were spent laying down.

At the time of the hearing, Minsky and her husband had moved in with her mother. The plaintiff's mother, son or husband did all of the cleaning and shopping while she was ill. Tasks such as bathing, dressing, and washing her hair were all difficult, and she occasionally did not do them. She had no social activities. She had to give up dog breeding, because she could no longer pick up the animals. She could not sit long enough to go to a movie.

Psychologically, Minsky testified that she often cries; she cried during the hearing. Stress made her pain worse, as did the weather.

### C. The Medical Evidence Presented at the Hearing

#### 1. *Dr. Jesse Stoff*

On July 25, 1994, Dr. Jesse Stoff, M.D., evaluated Minsky. During the evaluation, Minsky described a history of an adverse reaction to dental implants and viral infections. She tested positive for Coxcackie B. virus, Epstein–Barr virus and cytomegalovirus, and tested negative for lupus. Dr. Stoff concluded that Minsky suffered from mixed connective tissue disease. Following the initial evaluation, the plaintiff primarily was treated by Dr. Stoff by telephone.

In a report dated November 30, 1994, Dr. Stoff stated that Minsky "complains of severe fatigue, migratory myalgias and arthralgias, night sweats, recurrent low-grade fevers, insomnia, and dyslogia with a secondary reactive depression to her chronic illness which has rendered her totally disabled." He further noted that the "symptoms that she suffers with i.e. the severe fatigue, muscle weakness, myalgias, arthralgias, insomnia, and dyslogia have rendered her totally disabled in that she is usually totally bed bound unable to complete even minimal activities of daily living and relying upon the help of friends and family in order to accomplish her daily activities." Her "blood tests indicate a systemic response to her autoimmune disease." In Dr. Stoff's view, her "illness is likely to leave her permanently disabled or worse it if does not stop and reverse soon."

On December 7, 1994, the plaintiff told Dr. Stoff over the telephone that she was "doing well" and her back pain was gone. However, her hands and feet were still swollen.

In January 1995, after Minsky's insured status expired, Minsky spoke with Dr. Stoff four times because she was having trouble obtaining the intravenous treatments he prescribed. That same month, Dr. Stoff reported that he made a diagnosis of autoimmune syndrome and lupus. Her symptoms included severe fatigue, insomnia, myalgias, arthralgias, mallar rash, dyslogia, sore throats, swollen glands, muscle weakness, hypotoxia, headaches, night sweats, and blurred vision. He prescribed Prednisone, DHEA IV nutrients/amino acid supplements, and nutrient supplements. Clinical findings included lupus mallar rash, recurrent edema, recurrent joint symptoms and one episode of kidney failure. He reported that her fatigue was a disability, and that the condition was exacerbated by stress. Once fatigue began, she generally was in bed for several days. She was limited to lifting 2 to 4 pounds; her ability to stand and walk was less than 2 hours a day; she was able to sit less than 6 hours a day; and her pushing and pulling was limited, due to severe fatigue, myalgias, arthralgias, and muscle weakness.

Thereafter, Minsky spoke with Dr. Stoff approximately monthly, until an office visit in September 1995. During the September 1995 examination, Dr. Stoff's contemporaneous notes state that Minsky was doing "relatively good," and was "in remission" to the point of walking and sleeping

well, having "great" energy, shopping, "being busy, managing the business," and looking "great!!"

Toward the end of the year, on December 15, 1995, Dr. Stoff reported that Minsky continued to suffer from and be debilitated by severe fatigue, multiple migratory myalgia and arthralgia, night sweats, recurrent low-grade fevers, insomnia, dyslogia with depression. Also, she suffered an episode of kidney failure which responded to diuretic therapy and intravenous medications. At that time, in Dr. Stoff's opinion, Minsky was "totally disabled," and was "often house and bed bound due to severe insomnia, fatigue, myalgia, arthralgias and dyslogia. She required help to complete her basic ADL [activities of daily living]." While the doctor stated that "she continues to try to work as much as she can in order to maintain her business .. I do not believe it is in her best interest physically to work part time as she does .... I know, from talking with her husband and close friends, that there are many days where in she is unable to complete even basic minimal activities of daily living and must rely on their help in order to do so. Her disease process is severe." Further, the doctor opined that her "prognosis for recovery is guarded because of the multiplicity of organs and systems involv[ed]."

The following year, in May 1996, Dr. Stoff again reported that the plaintiff was under his care for progressive mixed connective tissue disease, which rendered her disabled.

### 2. *Dr. Popylansky*

Minsky was treated on a weekly basis by Dr. Uluis Popylansky, M.D., from October 28, 1994 through December 1994. In a Residual Functional Capacity Assessment Report dated February 6, 1995, Dr. Popylansky's diagnosis was mixed connective tissue disorder and lupus. He noted that her symptoms included fatigue, headaches (cephalagia), muscle aches (myalgia), skin rash, insomnia, swollen lymph nodes and recurrent sore throat. Dr. Popylansky's

examination revealed that the patient was 5 feet tall and weighed 200 pounds. Dr. Popylansky found no neurological deficits. He found she had limited motion in her upper and lower extremities due to pain and edema. He prescribed Prednisone in tapering doses and non-steroidal anti-inflammatory medication. Dr. Popylansky's Residual Functional Capacity Assessment stated that Minsky could sit up to 6 hours a day, stand and walk less than 2 hours a day, and could not lift or carry any weight. Dr. Popylansky stated that "when exacerbation any movement extremely painful." In his assessment, Minsky was "unable to concentrate," and had "memory impairment." He noted that her fatigue was brought on by minimal exertion and activities of daily living, and she had to rest for several hours once the fatigue began. The plaintiff also suffered from depression, secondary to fatigue.

### 3. *Dr. Ronald Hoffman*

Dr. Ronald Hoffman, M.D., provided Minsky with weekly nutritional support treatment between January 1995 and June 1995, immediately following the insured period. In a report dated July 13, 1995, he made a diagnosis of mixed connective tissue disease. He noted that she suffered from fatigue, joint pain and a butterfly rash. Although his physical examination of her was "not significant," Dr. Hoffman stated that her "fatigue limits [her] ability to function in a work setting." Dr. Hoffman was of the opinion that Minsky suffered from decreased focus and concentration; limited understanding and memory; and limited sustained concentration and persistence. He found that her ability to lift and carry was limited to 5 pounds; her ability to stand and/or walk was limited to up to 2 hours a day; her ability to sit was limited to up to 6 hours a day; and she had no limitation on her ability to push and pull.

### 4. *Dr. Thomas Argyros*

In January 1995, immediately following the insured period, Minsky began seeing

Dr. Thomas Argyros, M.D., a Clinical Professor of Medicine at New York University School of Medicine, Medical Director at Lenox Hill Hospital in Manhattan, Chief of Rheumatology at Lenox Hill Hospital, and formerly the Chief of Lupus Erythematosus and Related Diseases at Bellevue Hospital in Manhattan.

In his January 1995 report, Dr. Argyros stated, "Minsky notes that she looks as if she has a clear cut case of lupus." His report further states that during the previous year, in April 1994, when she sat for a time she had aching in her knees and it was hard to get up. At that time, her joints were swollen, and she had to be taken off Prednisone because "she could not function." Dr. Argyros observed that Minsky was "emotional and cried a lot." Minsky was experiencing "chest pain and shortness of breath." Testing revealed that the plaintiff's ANA (anti-nuclear antibody), rheumatoid factor and complement levels all were normal. Her C3 level was above normal. Dr. Argyros diagnosed undifferentiated connective tissue disorder. The doctor noted that she was feeling better and did not need systemic treatment.

On February 15, 1995, Minsky reported to Dr. Argyros that she was "ok" except that she was very stiff in the morning. Later that year, in August 1995, Dr. Argyros reported that Minsky had been weaned off the adrenal cortex injections Dr. Stoff prescribed. He noted that Minsky was on no medication and was in remission.

The doctor's March 13, 1996 notes indicate that Minsky is "doing 16 hour days," which the ALJ interpreted to mean that Minsky was *working* for 16 hours a day. In Dr. Argyros' records dated between February 1996 and June 1996, he notes that the plaintiff was experiencing great stress due to litigation surrounding her former business and her business partner buying her out. At various times, Minsky was suffering from butterfly lesions on her face, abdomen and thigh.

In June 1996, following the hearing, Dr. Argyros prepared a questionnaire, where

he stated that Minsky had mixed connective tissue disease with moderate joint and muscle involvement. He noted moderately severe mental involvement, with depression; moderately severe facial skin involvement; severe fatigue; and malaise. Dr. Argyros stated that although Minsky could sit for 3 hours in an 8 hour day, she could not do any standing or walking. She could occasionally bend, and occasionally lift and carry up to 10 pounds; she could never squat, crawl or climb. In his opinion, she was unable to tolerate customary work pressures.

### D. The Non–Examining Social Security Reviewing Physicians

#### 1. Dr. Grace Hughes

In March 1995, Dr. Grace Hughes, a rheumatologist, reviewed Minsky's medical records on behalf of Social Security, without conducting a physical examination. Dr. Hughes concluded that Minsky had the residual functional capacity to occasionally lift and carry 20 pounds, frequently lift and carry ten pounds, stand and walk 6 hours in an 8 hour workday, and sit 6 hours in an 8 hour work day.

#### 2. Dr. P.C. Pellegrino

In July 1995, Dr. P.C. Pellegrino, M.D., another non-examining Social Security review physician, agreed with the assessment of Dr. Hughes.

### E. The Expert Testimony at the Hearing

#### 1. Dr. Charles Plotz

Dr. Charles Plotz, a rheumatologist, testified at the hearing as a medical advisor on behalf of the Commissioner. Dr. Plotz did not examine Minsky; he merely reviewed her medical records and the reports of her treating doctors. He stated that Minsky's records showed intermittent complaints of joint achiness, rash, and other symptoms, which, in Dr. Plotz's view, the treating physicians correlated to her business problems and related stress. In

Dr. Plotz's opinion, Dr. Stoff's notes indicate virtually nothing, except for complaints of occasional achiness and some swelling and, in fact, often describe the plaintiff as doing or feeling well. Dr. Plotz testified that doctors do not ordinarily use the terms "doing well" or "feels well" to describe a patient's progress; instead, physicians generally would use the term "improved."

Dr. Plotz noted that in December 1995, all of the tests Dr. Argyros performed were completely within normal limits. In Dr. Plotz's view, the plaintiff's lack of a response to the large doses of Prednisone indicated that her disease was not severe. Also, Dr. Plotz noted that the record did not support Dr. Stoff's claim that the plaintiff experienced kidney failure. Rather, Dr. Plotz stated, the plaintiff experienced urinary retention and diarrhesis associated with Prednisone.

According to Dr. Plotz, the adrenal cortex injections Dr. Stoff recommended were outdated treatments given 40 to 50 years ago without much benefit, and now are considered not medically appropriate treatment. Similarly, Dr. Plotz testified that the intravenous drips were not appropriate medical treatment for a person with apparent symptoms of mixed connective tissue disease. Also, Dr. Plotz told the ALJ that Dr. Stoff's finding of elevated virus titers simply meant that at some time in Minsky's life she was exposed to the viruses; they did not explain her condition. Dr. Plotz dismissed Dr. Stoff's other findings regarding fatty acid, amino acid metabolism and neurotransmitters, and ACTH levels, because mainstream medical opinion would be that such elevated levels are only associated if there is independent evidence of the disease. In Dr. Plotz's opinion, there was no basis for significantly restricting Minsky's residual functional capacity.

### 2. Expert Vocational Testimony

Lynn Jones, a vocational exert, testified at the hearing on behalf of the Commissioner regarding the jobs an individual of Minsky's age, education and work experience would be able to perform, involving light exertion and low stress, and not requiring intense concentration. Jones identified that an individual could perform such jobs as office mail clerk, hand assembler and parking lot attendant. If Minsky were restricted to sedentary work, Jones identified possible jobs such as assembler, ticket-taker, and sedentary cashier.

### 3. The ALJ's Findings

The ALJ determined that Minsky was not disabled due to connective tissue disorder prior to December 31, 1994. In the ALJ's decision, he found that while the plaintiff had a severe impairment, it did not meet or equal the criteria of Section 14.06 of the Listing of Impairments. The ALJ also found that while Minsky was not able to perform her past relevant work as a business manager, kennel worker or credit sales representative, she retained the residual functional capacity for the full range of light work, except for lifting more than 20 pounds occasionally or 10 pounds frequently.

The ALJ found that the plaintiff's condition did not meet the diagnostic criteria of Section 14.06 of the Listing of Impairments for "undifferentiated connective tissue disorder." Section 14.06 of the Listing of Impairments provides:

> Undifferentiated connective tissue disorder (14.06)—This listing includes syndromes with clinical and immunologic features of several connective tissue disorders, but that do not satisfy the criteria for any of the disorders described; for instance, the individual may have clinical features of systemic lupus erythematosus and systemic vasculitis and the serologic findings of rheumatoid arthritis. It also includes overlap syndromes with clinical features of more than one established connective tissue disorder. For example, the individual may have features of both rheumatoid arthritis and scleroderma. The correct designa-

tion of this disorder is important for assessment of prognosis.

20 CFR Pt. 404, Subpt. P, App. 1. The ALJ found that she did not suffer from any of these diagnostic criteria, and that none of the laboratory tests indicated she had any of the conditions necessary to meet the "connective tissue disorder" criteria. Further, the ALJ determined that even if she met the diagnostic criteria, her impairment, including her symptoms, did not otherwise meet or equal the criteria of Section 14.06.

In addition, the ALJ determined that assuming the diagnostic criteria of Section 14.06 were met, Minsky's impairment should be assessed under Section 14.00B. However, the ALJ found that Minsky's impairment did not meet or equal Section 14.00B. That section requires "significant, documented, constitutional symptoms and signs of severe fatigue, fever, malaise, and weight loss. At least one of the organ/body systems must be involved to at least a moderate level of severity." Section 14.00B of the Listing of Impairments provides as follows:

14.00 Immune System

(B) Dysregulation of the immune system may result in the development of a connective tissue disorder. Connective tissue disorders include several chronic multisystem disorders that differ in their clinical manifestation, course, and outcome. They generally evolve and persist for months or years, may result in loss of functional abilities, and may require long-term, repeated evaluation and management.

The documentation needed to establish the existence of a connective tissue disorder is medical history, physical examination, selected laboratory studies, medically acceptable imaging techniques and, in some instances, tissue biopsy. However, the Social Security Administration will not purchase diagnostic tests or procedures that may involve significant risk, such as biopsies or angio-grams. Generally, the existing medical evidence will contain this information.

A longitudinal clinical record of at least 3 months demonstrating active disease despite prescribed treatment during this period with the expectation that the disease will remain active for 12 months is necessary for assessment of severity and duration of impairment.

To permit appropriate application of a listing, the specific diagnostic features that should be documented in the clinical record for each of the disorders are summarized for systemic lupus erythematosus (SLE), systemic vasculitis, systemic sclerosis and scleroderma, polymyositis or dermatomyositis, and undifferentiated connective tissue disorders.

In addition to the limitations caused by the connective tissue disorder per se, the chronic adverse effects of treatment (e.g., corticosteroid-related ischemic necrosis of bone) may result in functional loss.

These disorders may preclude performance of any gainful activity by reason of severe loss of function in a single organ or body system, or lesser degrees of functional loss in two or more organs/body systems associated with significant constitutional symptoms and signs of severe fatigue, fever, malaise, and weight loss. We use the term "severe" in these listings to describe medical severity; the term does not have the same meaning as it does when we use it in connection with a finding at the second step of the sequential evaluation processes in §§ 404.1520, 416.920, and 416.924.

20 CFR Pt. 404, Subpt. P, App. 1

The ALJ found that Minsky's testimony concerning her limitations and the severity of her symptoms was not fully credible. In this regard, the ALJ found that the "medical evidence establishes that [Minsky] has 'severe' early systemic lupus erythematosus, but that she does not have an impairment or combination of impair-

ments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4." Further, the ALJ stated that Minsky could perform the physical exertion and non-exertional requirements of work except for lifting more than 20 pounds occasionally or 10 pounds frequently; performing tasks that are more than simple and low stress in nature; performing tasks that require high levels of concentration; or those exposing her to significant amounts of environmental irritants. (Tr. 35). In reaching this conclusion, the ALJ "considered the most helpful testimony of Dr. Plotz, as well as the opinions of two different Social Security DDS reviewers, each of whom concluded that claimant could perform a full or wide range of light exertional activity." (Tr. 33).

In so finding, the ALJ rejected the opinions and assessments of the four treating physicians. With regard to three of the treating doctors, Dr. Stoff, Dr. Popylansky, and Dr. Hoffman, the ALJ accepted Dr. Plotz's statement that the three doctors "are well outside the mainstream of medicine." In this regard, the ALJ elaborated as follows:

> ... [I] must give some extra weight to the opinions of her treating physicians. I note, however, that I believe that of those treating physicians, only the views of Dr. Argyros are entitled to such extra weight. All three other physicians are so far out of the mainstream of medicine that I find their views to be seriously in question. Each of them accepts and uses methods of treatment (intravenous drips and adrenal cortex injections) that have no proven medical effectiveness whatsoever—a point on which the testimony established that even Dr. Argyros agrees. As for Dr. Stoff (the only physician who has a genuinely prolonged treatment relationship with claimant, albeit primarily "by mail" [and telephone]), I accept Dr. Plotz's testimony that so many of his other statements are flat-out preposterous that his medical conclusions are just unacceptable. He

does not even know—as not just Dr. Plotz but also Dr. Argyros pointed out—than an elevated C3 test is a good sign in connective tissue disease cases, not a bad one. Numerous other tests that he finds significant are simply absurd. So too, it seems to me, is his patently exaggerated statement that claimant is "fortunate to still be among us" [ ]except insofar as one might conclude, as I do, that some of the treatments he has advocated or prescribed for her complaints themselves have posed or might pose hazards to her health.

> I do not question claimant's right to resort to non-traditional practitioners .... However, I am not obliged to attach weight or significance to the conclusions of such practitioners, and do not do so here.

(Tr. at 32–33) (emphasis and parentheticals in original; brackets added).

With regard to Dr. Argyros, the ALJ acknowledged that he was "not subject to this [same] criticism." The ALJ noted that in Dr. Plotz's view, "Dr. Argyros considered to be a competent rheumatologist." However, while the ALJ accorded Dr. Argyros' opinion "extra weight," he nevertheless ultimately found it "outweighed by other evidence." First, the ALJ found that "there is extremely little evidence to support Dr. Argyros's conclusions, not merely in terms of medical signs and laboratory findings, but also in statements (or lack of statements) in his own treating notes." (Tr. at 33)(parentheticals in original). The ALJ cited as an example Dr. Argyros' summary from January 1995, which the ALJ described as "finding no clinical abnormalities," and which included a notation that Minsky was "feeling better and does not need systemic treatment."

## II.  DISCUSSION

### A.  Standard of Review

██ This Court reviews challenges to the Commissioner's decisions to determine whether they are supported by substantial

evidence. 42 U.S.C. § 405(g) (1994); *Brown v. Apfel,* 174 F.3d 59, 61–62 (2d Cir.1999)(citing *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991).) Substantial evidence means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Brown v. Apfel,* 174 F.3d at 62–63 (citing *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 [1971][quoting, in turn, *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 [1938]] ). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* at 62 (quoting *Mongeur v. Heckler,* 722 F.2d 1033, 1038 [2d Cir.1983] [per curiam] ). "In reviewing an ALJ's decision, we consider the entire administrative record, including new evidence submitted to the Appeals Council following the ALJ's decision." *Id.* (citing *Perez v. Chater,* 77 F.3d 41, 46 [2d Cir.1996] ). The Court's responsibility "is always to ensure that a claim has been fairly evaluated." *Id.* (quoting *Grey v. Heckler,* 721 F.2d 41, 46 [2d Cir.1983] ).

The Court evaluates Minsky's Social Security disability appeal within this framework.

### B. Availability of Benefits

Federal disability insurance benefits are available to those individuals who are "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a),(d). To be eligible for disability benefits under the Act, Minsky must establish her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has promulgated a five-step analysis for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. As the Second Circuit recently explained:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the Regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual function capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform ... [T]he claimant bears the burden of proof as to the first four steps, while the [Commissioner] must prove the final one.

*DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998)(*quoting Berry v. Schweiker,* 675 F.2d 464, 467 [2d Cir. 1982] ), *see also Balsamo v. Chater,* 142 F.3d 75, 79–80 (2d Cir.1998); *Schaal,* 134 F.3d at 501.

Here, the ALJ performed the above analysis. With respect to the first step,

the ALJ found that the plaintiff was not employed. At the second step, he found that the plaintiff's illness constituted a severe impairment which limited her ability to perform some work-related activities.

At the third step of inquiry, the ALJ was required to determine whether the impairment was among the list of impairments determined by the Social Security administration to be so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d). If the injuries do not fall under a specified listing, then the claimant can still establish eligibility by "equaling" a listed disability with the impairment or a combination thereof. 20 C.F.R. § 404.1520(d). Here, the ALJ concluded that the plaintiff was "severely impaired" but that she did not have an impairment or combination of impairments which would equal in severity those included in the listings.

Accordingly, the ALJ proceeded to determine the fourth step: whether the plaintiff retained the residual functional capacity to perform her past work. The ALJ found that she did not, but went on to conclude that there was other, limited light work which the claimant could perform.

## C. The Treating Physician Rule

The plaintiff disputes the ALJ's finding, and maintains that the ALJ committed legal error by failing to provide "good reasons" for discounting the opinions of her treating doctors, in accordance with 20 C.F.R. § 404.1527(d)(2).

As discussed earlier, four of the plaintiff's treating doctors concluded that she was disabled. As set forth above, Dr. Stoff reported in November 1994, January 1995, and December 1995, that Minsky continued to suffer from and be debilitated by severe fatigue, multiple migratory myalgia and arthralgia, night sweats, recurrent low-grade fevers, insomnia, dyslogia with depression. In Dr. Stoff's opinion, Minsky was "totally disabled," and was "often" house and bed bound. Dr. Popylansky also found that Minsky was

disabled, and made a diagnosis of mixed connective tissue disorder and lupus. He, too, noted that her symptoms included fatigue, headaches (cephalagia), muscle aches (myalgia), skin rash, insomnia, swollen lymph nodes and recurrent sore throat. Dr. Popylansky's residual functional capacity assessment stated that Minsky could sit up to 6 hours a day, stand and walk less than 2 hours a day, and could not lift or carry any weight. Dr. Popylansky stated that "when exacerbation any movement extremely painful." In his assessment, Minsky was "unable to concentrate," and suffered from "memory impairment." He noted that her fatigue was brought on by minimal exertion and activities of daily living, and she had to rest for several hours once the fatigue began. In his view, the plaintiff also suffered from depression, secondary to fatigue.

Dr. Hoffman reported in July 1995 that Minsky was suffering from mixed connective tissue disease. He noted that she suffered from fatigue, joint pain and a butterfly rash. Dr. Hoffman concluded that Minsky's "fatigue limits [her] ability to function in a work setting." The doctor assessed that Minsky suffered from decreased focus and concentration; limited understanding and memory; and limited sustained concentration and persistence. Dr. Hoffman found that her ability to lift and carry was limited to 5 pounds; her ability to stand and/or walk was limited to up to 2 hours a day; and her ability to sit was limited to up to 6 hours a day.

Finally, Dr. Argyros stated in June 1996 that Minsky was suffering from mixed connective tissue disease with moderate joint and muscle involvement. Dr. Argyros noted moderately severe mental involvement, with depression. In Dr. Argyros' opinion, Minsky was unable to tolerate customary work pressures. In addition, he found moderately severe facial skin involvement. The doctor also observed that the plaintiff suffered from severe fatigue and malaise. Dr. Argyros determined that Minsky could

sit for 3 hours in an 8 hour day; could occasionally lift and carry up to 10 pounds; and could not stand or walk.

There is no dispute that the law accords special evidentiary weight to the opinion of the treating physician. Specifically, the regulations state that:

Generally, we give more weight to opinions by your treating sources .... If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.127(d)(2), 416.927(d)(2).

■ "The opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999)(citing 20 C.F.R. § 404.1527[d][2] )(additional citations omitted); *see also Clark v. Commissioner of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir. 1998)(same); *Schisler v. Sullivan,* 3 F.3d 563, 567 (2d Cir.1993) (same). In analyzing a treating physician's report, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." *Rosa v. Callahan,* 168 F.3d at 79 (citing *McBrayer v. Secretary of Health and Human Servs.,* 712 F.2d 795, 799 [2d Cir. 1983] ).

The Second Circuit has stated the factors to be considered when the treating physician's opinion is not given controlling weight:

(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist. In addition, the regulations provide that the agency "will always give good reasons in [its] notice of deter-

mination or decision for the weight [it] gives [claimant's] treating source opinion."

*Clark,* 143 F.3d at 118 (citing 20 C.F.R. §§ 404.1527[d][2], 416.927[d][2] )(alterations in original); *see also Schaal,* 134 F.3d at 503–04 (citing same).

■ Here, the ALJ properly acknowledged the treating physician rule, but then determined that the rule did not apply to the opinions of Dr. Popylansky, Dr. Hoffman, and Dr. Stoff because these physicians were "so far outside of the mainstream of medicine." The ALJ elaborated, "I do not question claimant's right to resort to non-traditional practitioners .... However, I am not obliged to attach weight or significance to the conclusions of such practitioners, and do not do so here." (Tr. at 32–33). In the Court's view, this was error, for several reasons.

In the Court's view, the ALJ erred in not giving controlling weight to the opinions of the plaintiff's treating physicians, in view of the length and frequency of their examinations; the extensive nature of their treatment relationships with her; the physicians' evidence in support of the opinion; and their opinions' consistency with the record as a whole. Moreover, as the Commissioner must concede, at the very least, the opinion of Dr. Argyros is from a specialist.

Notably, all four of the plaintiff's treating doctors concurred that Minsky suffered from mixed connective tissue disease. All four of the plaintiff's treating doctors either expressly stated that Minsky was disabled, and/or implicitly found so by concluding that she lacked the residual functional capacity for sedentary work. All four of the plaintiff's treating doctors based their conclusions, in part, on their observations, made during independently-conducted clinical examinations. All four found that Minsky suffered from severe, persistent and debilitating symptoms, including: (1) severe fatigue; (2) recurrent rashes; and (3) swelling and/or pain in the joints. Dr. Argyros, Dr. Popylansky and

Dr. Stoff also noted that Minsky suffered from muscle pain and/or weakness. Thus, the opinions from the four treating doctors were well supported, and were consistent with the case record. Significantly, their opinions were not controverted by any Social Security Administration examining doctor. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

It was also improper for the ALJ to reject the opinions of Dr. Stoff, Dr. Hoffman, and Dr. Popylansky on the theory that they practiced "outside the mainstream of medicine." Tellingly, the Commissioner does not cite any case which stands for the proposition that an ALJ may reject a treating doctor's opinion when such physician is licensed but practices "outside the mainstream of medicine." The regulations provide that *"Medical opinions are statements from physicians* and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s) . . . ." 20 C.F.R. § 404.1527(a)(2) (emphasis added). Section 404.1513(a) lists five categories of "acceptable medical sources," including "licensed physicians." Apparently, all four of the treating doctors—including the three which the ALJ discredited outright based on their non-traditional method of treatment—are licensed physicians who hold the title of "M.D." in their respective States. Therefore, all three are considered an "acceptable medical source." 20 C.F.R. § 404.1513(a). The ALJ was bound to give their opinions "controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa v. Callahan,* 168 F.3d at 79. The ALJ's analysis in this regard was tainted by his statement that he was not required to engage in this analysis because the three physicians allegedly practice "outside the mainstream" of the medical profession. This failure to conform to the "treating physician" rule is error requiring remand.

■ Further, the ALJ committed error by substituting his own opinion for those of all four of the medical doctors. *See Rosa v. Callahan,* 168 F.3d at 79 (citing *McBrayer v. Secretary of Health and Human Servs.,* 712 F.2d at 799). While the ALJ did so on several occasions, the most notable instance occurred with regard to Dr. Argyros, the only one out of the four treating physicians whom the ALJ credited in any respect. For example, the ALJ discussed at length Dr. Argyros' ratings of "moderately severe" impairment of the mental system. The ALJ elaborated as follows:

> I accept Dr. Plotz's uncontradicted testimony that the only type of mental symptom that can be caused by connective tissue disease is psychoses. Certainly, claimant does have symptoms of depression, which could well be a secondary reaction to her medical problems but also (as the notes make clear) is related to the high stress levels of her legal problems with her business partner. Taking these factors into account, I conclude that claimant has no involvement of the mental system stemming specifically from any connective tissue disease.

(Tr. at 29) (parentheticals in original).

Similarly, the ALJ rejected Dr. Argyros's assessment of a "moderately severe" skin impairment, because Minsky's rashes were limited to her face and were "unaccompanied by pain [or] itching . . [which] is simply not a 'moderately severe' involvement of the skin." (Tr. at 29). Also, the ALJ dismissed Dr. Argyros's finding of "moderate" involvement of the joints and muscles because there was "no report of limitation of motion of any joint, or any measured muscle weakness, or indeed any specific degree of pain to palpitation or otherwise." In the Court's view, such remarks constitute reversible error under Second Circuit settled case law.

To illustrate, in *Rosa v. Callahan,* 168 F.3d at 79, the ALJ "did not report findings of muscle spasm to corroborate any loss of motion." The Second Circuit held

that "[b]y attaching such significance to this omission, however, the ALJ made fundamentally the same error as this Court has identified on at least two occasions." *Id.* (citing *Wagner v. Secretary of Health and Human Services,* 906 F.2d 856, 861 [2d Cir.1990]; *Balsamo,* 142 F.3d at 81). Similarly, in *Wagner,* the Second Circuit held that an ALJ had no sufficient basis for concluding that a treating physician's failure to report that a claimant suffered from "headaches and left-sided weakness" precluded a diagnosis of "hemiplegic migraine." *Wagner,* 906 F.2d at 861. In *Balsamo,* the Second Circuit found that an ALJ had improperly made a medical determination by concluding that an absence of "atrophy of any muscle groups" was inconsistent with a finding of disability. *Balsamo,* 142 F.3d at 81. As in each of these cases, here, the ALJ improperly used his own alleged expertise against that of the treating physicians. *Id.*

■ In addition, the ALJ erred by rejecting the treating physicians' diagnoses without first attempting to fill any perceived gaps in the administrative record. *See Schaal,* 134 F.3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte."); *see also Hartnett v. Apfel,* 21 F.Supp.2d 217, 221 (E.D.N.Y.1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly"). In fact, where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history "even when the claimant is represented by counsel." *Perez,* 77 F.3d at 47; *see also Pratts,* 94 F.3d at 37 ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must himself affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.' This duty ... exists

even when ... the claimant is represented by counsel.") (citations omitted).

The ALJ repeatedly asserted that there were inconsistencies between the doctors' ultimate conclusions and their contemporaneous notes. In some instances, the Court disagrees with the ALJ. For example, the ALJ makes much of the fact that in January 1995, Dr. Argyros reported normal clinical findings except for a butterfly rash on her face and stated that "she is feeling better and does not need systemic treatment." However, the ALJ omitted other salient portions of the doctor's January 1995 notes, including the following: (1) "Minsky notes that she looks as if she has a clear cut case of lupus"; (2) in "April 1994 when she sat for a time she had aching in her knees and it was hard to get up;" (3) her "joints are currently swollen"; (4) she had to be taken off Prednisone because "she could not function"; (5) she was "emotional and cried a lot"; (6) she has "chest pain and shortness of breath." Significantly, two months later, Dr. Argyros diagnosed her with connective tissue disorder of an undifferentiated type.

Another example of an instance where the Court disagrees with the ALJ's finding of an inconsistency relates to Dr. Argyros' March 13, 1996 notes indicating that Minsky was "doing 16 hour days." The ALJ interpreted to mean that Minsky was *working* for 16 hours a day at that time. Even if this is a fair reading, Dr. Argyros' note refers to "16 hours days" in *March 1996,* more than a year after Minsky's insured status expired, in December 1994.

However, irrespective of whether the ALJ correctly perceived inconsistencies between the doctors' final diagnoses and their contemporaneous notes, such contradictions should have prompted the ALJ to pursue additional information regarding Minsky's medical history. "It is entirely possible that [the doctors], '[i]f asked,' could have provided a sufficient explanation for any seeming lack of support for [their] ultimate diagnos[es] of complete disability." *Rosa,* 168 F.3d at 80 (quoting

*Clark,* 143 F.3d at 118). As the Second Circuit recognized in *Rosa* and *Clark,* a treating physician's "failure to include this type of support for the findings in his report does not mean that such support does not exist; he might not have provided this information in the report because he did not know that the ALJ would consider it critical to the disposition of the case." *Id.* (citing *Clark.*).

■ In addition, this Court assigns error to the ALJ's significant and repeated reliance on the testimony of the Medical Examiner, Dr. Plotz, as well as the opinions of the two non-examining Social Security reviewing physicians, Dr. Hughes and Dr. Pellegrino. It is obvious that the ALJ based his ultimate findings, to a great extent, on the testimony of Dr. Plotz, which the ALJ cited throughout his decision when rejecting the treating physicians' findings and conclusions. Moreover, the ALJ relied on Dr. Plotz's opinion regarding his interpretation of the treating doctors' notes. Notably, the ALJ stated that "Dr. Plotz—who is one of the most well-respected rheumatologists in the New York area—testified that claimant's records show her to have intermittent complaints of joint achiness, and rash, and other symptoms, which the notes clearly show are highly correlated to her business problems and resulting stress," as opposed to a connective tissue disease. Tellingly, on one occasion, the ALJ stated that "I have also considered the most helpful testimony of D. Plotz, as well as the opinions of two different Social Security DDS reviewers, [Dr. Hughes and Dr. Pellegrino,] each of whom concluded that claimant could perform a full or wide range of light exertional activity." (Tr. 33). In the Court's view, by

> thus elevating the opinion of the medical adviser, who never had examined [Minsky], over that of .. her treating physician[s], the ALJ. violated a general rule adopted in all, or virtually all, of the circuits. Dr. [Plotz's] job as a medical adviser was to explain complex medical

problems in terms understandable to lay examiners. *The general rule is that the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant.* (citing cases).

*Vargas v. Sullivan,* 898 F.2d 293, 295–96 (2d Cir.1990) (emphasis added).

Further, in the face of the overwhelming record evidence of disability, the findings of the non-examining reviewing doctors "are entitled to relatively little weight." *Simmons v. U.S. R.R. Retirement Bd.,* 982 F.2d 49, 56 (2d Cir.1992). Dr. Plotz, Dr. Hughes and Dr. Pellegrino never examined Minsky; they merely reviewed her medical records. The Second Circuit has held that the opinions of such non-examining physicians "cannot constitute substantial evidence to overcome a consensus among [the claimant's] examining doctors—including treating physicians—that [she] was disabled." *Id.* (citing *Hidalgo v. Bowen,* 822 F.2d 294, 298 [2d Cir.1987] [testimony of nonexamining medical advisor "does not constitute evidence sufficient to override the treating physician's diagnosis"]; *Havas v. Bowen,* 804 F.2d 783, 786 [2d Cir.1986] ["opinions of non-examining medical personnel cannot in themselves constitute substantial evidence overriding the opinions of examining physicians"]).

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied, and the plaintiff's cross-motion for judgment on the pleadings is granted.

**D. Disposition**

■ Where there is no apparent basis to conclude that a more complete record might support the Commissioner's decision, the Court may opt simply to remand for a calculation of benefits. *See, e.g., Balsamo,* 142 F.3d at 82. In *Balsamo,* the Second Circuit remanded for the

calculation of benefits because the ALJ reached a mistaken conclusion on an otherwise complete record. In the Court's view, this rule is appropriate in this case, where four treating doctors reached the same conclusion that the plaintiff was disabled during the relevant time frame; there is no contrary opinion from an examining physician; and it is now almost five years after the end of the insured period.

## III.  CONCLUSION

Having reviewed the parties' submissions, and for the reasons set forth above, it is hereby

**ORDERED,** that the defendant's motion for judgment on the pleadings pursuant to Fed.R.Civ.P.12(c) is denied; it is further

**ORDERED,** that the plaintiff's cross-motion for judgment on the pleadings pursuant to Fed.R.Civ.P.12(c) is granted; it is further

**ORDERED,** that the Commissioner's decision is reversed and this case is remanded to the Commissioner of Social Security for the sole purpose of calculating the benefits due to the plaintiff; and it is further

**ORDERED,** that the Clerk of the Court is directed to close this case.

**SO ORDERED.**