Madeline STONE Plaintiff

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security Defendant

No. 3:03CV449(CFD)(TPS).

United States District Court,
D. Connecticut.

April 27, 2004.

---

Allan B. Rubenstein, New Haven, CT, for Madeline Stone, Plaintiff.

Ann M. Nevins, U.S. Attorney's Office–BPT, Bridgeport, CT, for Social Security Administration, Jo Anne B. Barnhart Comm, Defendant.

### ORDER

SQUATRITO, District Judge.

Upon a full and *de novo* review and pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72.2(b) of the Local Rules for United States Magistrate Judges (D.Conn.), Magistrate Judge Thomas P. Smith's Recommended Ruling (Doc. # 14), is **APPROVED** and **ADOPTED** as the Ruling of this Court, over objection.

**IT IS SO ORDERED.**

SMITH, United States Magistrate Judge.

### MAGISTRATE JUDGE'S OPINION

The plaintiff, Madeline Stone, has brought this appeal under 42 U.S.C. § 405(g) (the "Act") seeking review of a final decision by the Commissioner of the Social Security Administration (the "SSA") denying her application for disability insurance benefits. The plaintiff has moved for an order reversing the Commissioner's decision or, in the alternative, for a remand for a rehearing (**Dkt. # 8**) and the defendant has moved for an order affirming her decision. (**Dkt. # 11**). For the reasons stated below, the plaintiff's motions should be **DENIED** and the defendant's motion **GRANTED**. 28 U.S.C. § 636(b)(1)(A).

### I. ADMINISTRATIVE PROCEEDINGS

On March 10, 2000, the claimant applied for disability insurance benefits. (Tr. 133–35). The application was denied initially (Tr. 97–100) and on reconsideration (Tr. 103–06) by the SSA. The claimant appealed and was afforded a hearing before Administrative Law Judge Robert A. DiBiccaro (the "ALJ") on September 6, 2001. (See Tr. 17–94). Having considered the plaintiff's claim *de novo* the ALJ determined, in a decision dated April 25, 2002, that the plaintiff was not disabled within the meaning of the Act. (Tr. 7–16). Subsequently, on January 13, 2003, the Appeals Council of the SSA denied the claimant's request for review, thus rendering the ALJ's decision the final decision of the SSA. (Tr. 4–5). As a result, the claimant filed this complaint on March 13, 2003.

### II. STATEMENT OF FACTS

The record discloses the following relevant facts. The plaintiff is a sixty-year-old female with a high school education. (Tr. 11). Her past work experience includes employment as a real estate agent, a mortgage loan inspector, and she owned a janitorial service. (*Id.*).

In mid-December of 1998, on the referral of James McCormick, M.D., a pulmonary specialist, the plaintiff was hospitalized at Rhode Island Hospital where she underwent surgery to remove a posterior hilar mass from her left lung. (Tr. 179). Her pre- and post-operative diagnosis was adenocarcinoma. (*Id.*). Henning Gaissert, M.D., who performed the surgery, re-

marked that "[t]here were no complications" and that the "patient tolerated the procedure well." (Tr. 180). In a letter to Dr. McCormick twelve days after the plaintiff's discharge, he noted that "she has done well with the exception of mild chest discomfort." (Tr. 280). Soon thereafter, Dr. McCormick noted that "pain is a major problem." (Tr. 206). She was using Vicodin to treat her pain. (*Id.*).

On April 21, 1999, in another letter to Dr. McCormick regarding the plaintiff's four-month follow-up visit, Dr. Gaissert remarked that the "patient is doing well but still has mild to moderate chest discomfort. She also complains of a discomfort when moving her arm ... As a result, on physical exam, she has significant reduction in abduction and extension of the left shoulder joint." (Tr. 277). Dr. Gaissert referred the plaintiff for physical therapy. (*Id.*).

Michelle G. Lussier, PT, CSCS, a physical therapist at Westerly Hospital, initially evaluated the plaintiff. (Tr. 264–66). She noted that the plaintiff "demonstrates slightly decreased arm swing" in her left arm while walking. (Tr. 264). She also determined the plaintiff's range of motion [1] and tested her grip.[2] (Tr. 265). She noted that "[t]he patient presents with moderate pain, limited ADL's [activities of daily living], decreased range of motion, and functional strength of left upper extremity" but opined that the plaintiff would experience a "complete resolution of symptoms over approximately four to six weeks." (*Id.*). Regarding a follow-up visit, on October 20, 1999, Dr. Gaissert, in a letter to Dr. McCormick, remarked that the plaintiff "continues to have discomfort in her chest.

The range of motion in her left shoulder is now back to normal. She has no pain when moving her left arm." (Tr. 275).

However, in January of 2000, Dr. McCormick referred the plaintiff to Westerly Hospital's Pain Clinic for evaluation because of reports that she "continued to experience left-sided chest and arm discomfort as well as hyperesthesia of the left chest." (Tr. 203–06). Dr. McCormick noted that the plaintiff "received physical therapy with some improvement" and that "she describes the pain as sharp and not significantly improved over the last six months. She is unable to work or lift heavy objects secondary to the pain.... She is unable to tolerate anyone touching her on the back or chest area." (*Id.*). He recommended localized injections or PO medications. (Tr. 203).

On February 1, 2000, the plaintiff began treatment with Timothy Connelly, D.O.. On initial exam, Dr. Connelly noted that the plaintiff was "in no acute distress. Chest is symmetric with a well healed scar in the axillary line on the left as well as two small scars in the mid-clavicular line from the chest tubes." (Tr. 259). She was given Neurontin to help control her pain. (*Id.*). On February 29, Dr. Connelly performed a localized scar injection. (Tr. 256). He noted that the plaintiff "does present an odd history of pressure-like feeling over her left chest and back. Some of her back pain seems to be improved." (*Id.*).

While it is not clear from the record whether the plaintiff visited Dr. Connelly again before May, she did return for a set of rib injections on May 8. (Tr. 337–38). Again, Dr. Connelly noted that the plaintiff

---

**1.** Cervical flexion 52 . Extension 48 . Side bending 22 right, left 14 . Rotation right 50 , left 60 . Left shoulder range of motion in sitting, shoulder flexion 124 . Abduction 113 . Extension 52 . In supine, shoulder flexion 138 . Abduction 133 . External rotation 85 . Internal rotation 78 .

**2.** Right 47 lbs., left 35 lbs.

was in no acute distress. (Tr. 337). He examined her chest and observed it to be symmetric with well healed scar on the mid axillary line on the left as well as two small scars in the midclavicular line from the chest tubes. There is a dysesthetic sensation over her scars as well as in an area on her left breast. She also has exquisite tenderness over the ribs 10, 9 and 8 starting 8 cm posterior to the mid axillary line extending anteriorly.

(*Id.*). His impression was that the plaintiff was "status post left lower lobe resection with post thoracotomy pain, somatic pain." (*Id.*). He also noted that she "did very well with her last set of rib injections with 2.5 weeks of pain relief" and decided to repeat the procedure. (*Id.*).

The plaintiff returned on May 22 and reported a 30% improvement. (Tr. 340). The procedure was repeated. (*Id.*). Her next visit was on June 8. (Tr. 341). She again reported a 30% improvement and stated that she "has been increasing her activity and just recently took a vacation which required prolonged sitting at the end of the day." (*Id.*). Dr. Connelly also remarked that she "feels she has longer time intervals between her exacerbation and today notes her pain at about a two out of ten on the visual analog scale." (*Id.*). The rib injections were repeated. (*Id.*).

On June 22, Firooz Golkar Sisani, M.D. evaluated the plaintiff's residual function capacity ("RFC"). (*See* Tr. 95, 315–23). His evaluation was based solely on the record. (*See* Tr. 13). Dr. Sisani concluded that she could occasionally lift and/or carry 20 pounds, that she could frequently lift and/or carry 10 pounds, that she could stand and/or walk (with normal breaks) for a total of about 6 hours in an 8–hour workday, that she could sit (with normal breaks) for a total of about 6 hours in an 8–hour workday, and that she was unlimited in her ability to push and/or pull subject to the twenty- and ten-pound weight restrictions. (Tr. 316). However, he noted that she is occasionally limited in climbing ramps, stairs, ladders, ropes, or scaffolds (*see* Tr. 317), and she is limited in reaching overhead with her left arm. (*See* Tr. 318).

The plaintiff visited Anna Sottile, M.D. on July 14 for another round of injections. (Tr. 343–44). Dr. Sottie reported that the plaintiff "is noting improvement. She has had almost complete resolvement of the skin sensitivity and about 30% improvement overall. She did have a flare up and reported that the pain returned to its original intensity." (Tr. 344). On August 3, however, Dr. Sottile remarked that "today it seems she is the best to date and again is saying about a 40% improvement overall." (Tr. 351). The plaintiff received another set of injections. (Tr. 350–51).

On August 14, Joel Deutsch, M.D. evaluated the plaintiff's RFC. (Tr. 96, 324–31). His evaluation was also based solely on the record. (*See* Tr. 13). Dr. Deutsch found the same exertional limitations as Dr. Sisani. (*See* Tr. 325). However, he concluded that while the plaintiff could occasionally climb a ramp or stairs, she could never climb a ladder, rope, or scaffold. (Tr. 326). Moreover, Dr. Deutsch found that the plaintiff's overhead reach was limited, but did not specify whether one arm was more capable than the other. (Tr. 327).

A week later, the plaintiff returned to Dr. Connelly to obtain injections. (Tr. 352–53). She reported an overall 40% improvement. (Tr. 353). She had similar treatments on September 5 (Tr. 354–55) and September 25, reporting "much less skin sensitivity over the area of the pain, but ... still report[ing] feeling an area of tightness and pressure." (Tr. 345). After an October 27 visit, Dr. Connelly remarked that she "is still having improvement. It

was explained that we will continue with these [injections] as long as she is still on an improving course. She feels that she has decreased sensitivity. She is able to tolerate tactile sensation over the area whereas this was not the case before." (Tr. 357). Dr. Connelly also noted that she "was able to let her husband give her a massage when usually she is unable to touch her skin." (Tr. 356). Then, on a January 9, 2001 visit, Dr. Connelly reported a 50% improvement in her pain and a "smaller area of pain and decreased sensitivity." (Tr. 358).

However, the plaintiff did not return to Dr. Connelly until April 9, at which time he reported that "[s]he says her pain has dramatically worsened" due to the amount of time between injections. (Tr. 360). She was given another set of injections and returned on May 10, at which time Dr. Connelly reported that she was back up to 50% improvement. (Tr. 362). He stated that the plaintiff "noticed after her last injection how much she was doing with that. . . . [she][c]ontinues to do extremely well. . . . she and I are both impressed with her progress." (*Id.*). Her next visit was on June 14. (Tr. 363). Again, Dr. Connelly reported a 50% improvement. (*Id.*). And again, on July 25, Dr. Connelly remarked that "[s]he has had a good six weeks. She is going well. She has gone away on vacation. . . . She is still having problems with the trapezius muscle and the rib but feels they really are not as bad as they were before." (Tr. 364). He also noted that "[o]verall, she thinks she is doing quite well and she is pleased with her results." (*Id.*).

On September 6, 2001, the plaintiff attended a hearing before ALJ Robert A. DiBiccaro. (Tr. 19–94). She testified that she could not work a 40–hour week in which she could alternatively sit and stand because

> [t]he pain is there whether I move or not. There is always a measure of pain. And with anything that I do, the pain increases through the day. Even a day that I have—I do limited—have a limited schedule. I still—the pain still increases through the day. Sitting—on my feet and walking a little is comfortable. But I know that I can't do that all day. So then I'll need to rest awhile.

(Tr. 38). She admitted to performing various household chores such as cleaning, mowing the lawn, changing bed sheets, and doing the laundry, but said that "it's a strain." (Tr. 39). She opined that a sustained 40–hour work week with no physical requirements would also "be a strain" and that "if I made it through that day, the next day I would pay for it. The next day or even into the following day." (Tr. 40). She admitted that she "could work probably for a couple of hours. But then I would have things at home that I would have to do. And then it would be the next day, I know I would pay for it. I would be exhausted." (Tr. 42). She maintained that she does not have the stamina that she once possessed. (Tr. 46). She claimed to be in pain at the hearing. (Tr. 43).[3] She also testified that she continued to receive the trigger point injections. (Tr. 44).

Ronald Freedman, a vocational expert, also testified at the hearing. (Tr. 51–94). Mr. Freedman considered the plaintiff's real estate work to be on the high end of semi-skilled and at a light exertional level. (Tr. 57). In addition, he considered her cleaning business to be unskilled and at a medium exertional level. (*Id.*). Moreover, he considered her mortgage inspector work to be skilled and at a light exertional level.

---

**3.** On a scale of 1 to 10, she rated her level of pain as a 5. (Tr. 43).

Assuming that the plaintiff could operate at a sedentary exertional level, except a maximum of five pounds lifting, with no overhead lifting with her left non-dominant arm, only occasional use of the left hand and arm otherwise, no exposure to moderate amounts of fumes, dust, gasses, or other environmental irritants, good ventilation, and a sit/stand option, Mr. Freedman testified that the plaintiff would not be able to perform her past work. (Tr. 59–61). However, Mr. Freedman concluded that, based on the plaintiff's age, educational background, work experience, and RFC, she could work as a loan inspector for a bank, there being 400–500 positions statewide and 40,000–50,000 nationally. (Tr. 62). He also concluded that the plaintiff could work as an information clerk in the property insurance field, there being 100–200 positions statewide and 15,000–20,000 nationally. (Tr. 65). He also concluded that the plaintiff could work as an insurance checker. (Tr. 66).

The plaintiff returned to Dr. Connelly on September 21. (Tr. 365). He noted that she "tries to push things to the limit before she comes in and she has been in a lot of pain for several weeks." (*Id.*) Still, on October 23, she was reported as "doing much better." (Tr. 366). Then on November 11, Dr. Connelly's last entry of record, he remarked that the plaintiff

is quite happy with how things are going, compared to September 21st, when she came in with significant flare-up. She is 50% better concerning her rib pain, and since the October 23rd injection, where I did a left SI joint injection, she is 90% better as far as pain is concerned in the left parasacral area. She is really pleased with how that injection has helped her pain. She notices that she is able to control her pain as long as she is able to lie down and rest. If she is unable to lie down and rest when her pain starts to escalate, then it gets out

of control. Her ability to rest in the afternoons, and take a nap in the morning, has helped her pain tremendously. (Tr. 367).

## III. STANDARD OF REVIEW

In reviewing a decision of the [Commissioner] under § 405(g), the district court performs an appellate function. *Zambrana v. Califano,* 651 F.2d 842, 844 (2d Cir. 1981); *Igonia v. Califano,* 568 F.2d 1383, 1387 (D.C.Cir.1977). A reviewing court will "set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir. 1998). *See also Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990) ("As a general matter, when we review a decision denying benefits under the Act, we must regard the [Commissioner's] factual determinations as conclusive unless they are unsupported by substantial evidence") (citations omitted). "Substantial evidence" is less than a preponderance, but "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). *See Yancey v. Apfel,* 145 F.3d 106, 110 (2d Cir.1998); *Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988).

In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). *See also State of New York v. Sec'y of Health and Human Services,* 903 F.2d 122, 126 (2d Cir.1990) (stating that the court, in assessing whether the evidence which supports the Commissioner's position, is required to

"review the record as a whole") (citations omitted). Moreover, the standard should be applied in light of the fact that the Act "is a remedial statute, to be broadly construed and liberally applied." *Gold v. Sec'y of Health Educ. & Welfare,* 463 F.2d 38, 41 (2d Cir.1972) (citations omitted).

The regulations promulgated by the Commissioner establish a five-step analysis for evaluating disability claims. *Bowen v. Yuckert,* 482 U.S. 137, 140–142, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); 20 C.F.R. § 404.1520 (2004). First, the Commissioner considers if the claimant is presently working in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If not, the Commissioner next considers if the claimant has a medically severe impairment. *Id.* § 404.1520(a)(4)(ii). If the severity requirement is met, the third inquiry is whether the impairment is listed in Appendix 1 of the regulations or is equal to a listed impairment. *Id.* §§ 404.1520(a)(4)(iii); Pt. 404, Subpt. P.App. 1. If so, the disability is granted. If not, the fourth inquiry is to determine whether, despite the severe impairment, the claimant's residual functional capacity allows him or her to perform any past work. *Id.* § 404.1520(a)(4)(iv). If a claimant demonstrates that no past work can be performed, it then becomes incumbent upon the Commissioner to come forward with evidence that substantial gainful alternative employment exists which the claimant has the residual functional capacity to perform. *Id.* § 404.1520(a)(4)(v). If the Commissioner fails to come forward with such evidence, the claimant is entitled to disability benefits. *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990); *Berry,* 675 F.2d at 467.

While the claimant bears the burden of proving the first four steps, the Commissioner must prove the final one. *Berry,* 675 F.2d at 467. Thus, if the claimant is successful in showing that she is unable to continue his past relevant work, "the [Commissioner] then has the burden of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986).

## IV. DISCUSSION

### A.

The ALJ conceded that the plaintiff has not engaged in substantial gainful activity since the alleged onset of the disability and admitted that the plaintiff's impairment is 'severe' in accordance with 20 C.F.R. § 404.1520(c). (Tr. 15). Furthermore, the ALJ found, and the plaintiff does not contest, that the plaintiff is not disabled *per se:* her impairments do not meet or medically equal a listed impairment in Appendix 1 of Subpart P of the regulations. (*Id.*). Finally, the ALJ agreed that plaintiff is incapable of performing any of her past work. (*Id.*). The plaintiff argues, however, that the ALJ erred in his assessment that alternative employment existed which she could perform. Specifically, she claims that he "acted as his own medical expert, created an RFC with no basis in the record, made an improper credibility finding, and improperly used the Medical Vocational Guidelines." (Pl.'s Mem. Supp. Mot., 8/26/03, at 2).

The issue, then, is whether the ALJ's determination that alternative employment existed given the plaintiff's RFC is based upon legal error or is not supported by substantial evidence. As set forth below, the court finds that the ALJ's determination is not based upon legal error and is supported by substantial evidence in the record.

First, the plaintiff argues that "[t]o allow the Commissioner and the ALJ to

ignore and thereby reject the medical evidence without any basis in the record is to allow the ALJ to act as his own medical expert." (*Id.* at 21). She cites *Aubeuf v. Schweiker*, 649 F.2d 107, 113, n. 8 (2d Cir.1981) for the proposition that "[a]n ALJ cannot make a medical opinion which is beyond his competence." (Pl.'s Mem. Supp. Mot., 8/26/03, at 21). This case is markedly different.

In *Aubeuf*, the ALJ rebutted the treating physicians' observations and the plaintiff's testimony by relying, in part, on the plaintiff's "exhibition of no outward signs that could be related to a severe pain complex" at the hearing. 649 F.2d at 113 (quotations omitted). The court found that, to the extent that the determination was based on his own unqualified medical opinion, it was erroneous. No such conduct is alleged in the present case.

■ The plaintiff contends that the ALJ ignored and thereby rejected medical evidence without any basis. However, she is unable to point to any medical evidence that the ALJ ignores. The evidence which the plaintiff contends the ALJ ignored and rejected is almost exclusively her own testimony at the hearing. (*See* Pl.'s Mem. Supp. Mot., 8/26/03, at 18–20).[4] Such evidence is not *medical* evidence. Moreover, the ALJ is permitted to evaluate the credibility of the plaintiff's testimony in light of the underlying medical evidence in the record. *See McBrayer v. Sec'y of Health & Human Services*, 712 F.2d 795, 799 (2d Cir.1985). As such, the court is not convinced that the ALJ acted as his own medical expert.

Second, the plaintiff argues that the ALJ created an RFC with no basis in the record. "Residual functional capacity" is defined as "the most you can still do despite your limitations." 20 C.F.R. § 404.1545(a)(1). It is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96–8p ("regular and continuing basis" means 8 hours per day, 5 days per week, and its equivalence).

■ In determining whether the claimant has the residual functional capacity to perform other work, the Commissioner must evaluate the claimant on the basis of four factors: "(1) the objective medical facts; (2) diagnoses or medical opinions based on these facts; (3) subjective evidence of pain and disability testified to by the claimant and family or others; and (4) the claimant's educational background, age, and work experience." *Gold*, 463 F.2d at 41 n. 2. However, subjective reports will not alone establish a disability; objective medical evidence must also be present. 20 C.F.R. § 404.1529(a) ("... there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged...."). "Objective evidence" is defined as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." *Id.* § 404.1529(c)(2).

■ Moreover, the ALJ is not required to "reconcile every conflicting shred of medical testimony." *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir.1981). All that the

---

**4.** The plaintiff also points out that "[t]reating physician Dr. Connolly stated *she notices* that she is able to control her pain as long as she is able to lie down and rest." (Pl.'s Mem. Supp. Mot., 8/26/03, at 18)(emphasis added).

However, as is evident from the emphasized portion, this is not medical evidence either; it is simply a treating physician's memorialization of the plaintiff's thoughts and observations.

Act requires is that his determination is supported by substantial evidence. However, the ALJ must include in his opinion a "resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work...." SSR 95–5p.

The ALJ ultimately found that the plaintiff has the residual functional capacity

for sedentary activities that do not require lifting in excess of five pounds with no overhead lifting or reaching with her left arm, only occasional use of her non-dominant left hand and arm, with the option of sitting or standing at will, with additional environmental restrictions to working in areas of moderate to excessive amounts of fumes, dust, or poor ventilation.

(Tr. 16). The regulations define "sedentary work" as involving

lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). In addition, the SSA has defined "occasionally" as meaning

occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8–hour workday, and sitting should generally total approximately 6 hours of an 8–hour workday. Work processes in specific jobs will dictate how often and how long

a person will need to be on his or her feet to obtain or return small articles. SSR 83–10.

The plaintiff argues that this RFC determination "ignores vital and uncontested limitations" and that the ALJ was "very selective in what medical evidence he noted in his decision." (Pl.'s Mem. Supp. Mot., 8/26/03, at 23). As support for her position, she cites several pieces of the record which were not specifically included in the ALJ's opinion and, on that basis, concludes that the ALJ's RFC determination "is utterly unsupported." (*Id.* at 26).

As aforementioned, the medical evidence contained in the record is sparse. In determining the plaintiff's RFC, the ALJ reviewed all of the evidence in the record. (Tr. 10). Specifically with regard to her RFC, the ALJ noted that the plaintiff

reported pain and stiffness in her arm; but alleges that chronic chest and back pain restrict her activities. She alleges that she has good and bad days and that she is unable to perform any of her past jobs. She stated that she is unable to do heavy chores. Also, she alleges that she is unable to drive long distances, climb, bend, and stand to the degree necessary to inspect property and perform the tasks of a real estate agent.

(Tr. 13). This is consistent with the record. (*See* Tr. 19–94). With regard to her living situation, the ALJ reported that the plaintiff

gets up, has coffee, watches a morning television program, makes her bed, showers, dresses, and rests. After eating she attends appointments, does light housekeeping, laundry, and shopping. She reported that activities take her longer to do then [sic] previously, and she has to pace herself.

The claimant reported that she goes out independently one to two times a week, and drives without restrictions.

She stated that she goes out to lunch with others and talks with friends and family by telephone. The claimant listed her interests as: reading, cooking sewing, watching television, and gardening. She stated that ... her condition has prevented her from fully accomplishing the things she previously did. She noted that she no longer goes out at night due to discomfort and fatigue.

(Tr. 13). This is also consistent with the record. *See* Tr. 19–94.

In addition, the ALJ considered the opinions of the state agency physicians, as required by the social security regulations. *See* SSP 96–6p. As aforementioned, Drs. Sisani and Deutsch evaluated the plaintiff's RFC based on the record. They each concluded that the plaintiff could occasionally lift and/or carry 20 pounds, that she could frequently lift and/or carry 10 pounds, that she could stand and/or walk (with normal breaks) for a total of about 6 hours in an 8–hour workday, that she could sit (with normal breaks) for a total of about 6 hours in an 8–hour workday, and that she was unlimited in her ability to push and/or pull subject to the twenty- and ten-pound weight restrictions. (Tr. 316, 325). However, given that "they did not personally examine the claimant or have available to them the evidence submitted at the hearing including the claimant's testimony that indicates more significant limitations" the ALJ gave little weight to their opinions. (Tr. 13). Taking these limitations into consideration, the ALJ made his RFC determination. The court finds that the ALJ's RFC determination is supported by substantial evidence.

Third, the plaintiff claims that the ALJ made an erroneous credibility finding by failing to correctly consider the plaintiff's testimony. (Pl.'s Mem. Supp. Mot., 8/26/03, at 27–29). As the plaintiff points out, the ALJ is required to consider the testimony of the plaintiff and to make findings to determine the credibility of that testimony. (*Id.*, *citing Williams v. Bowen*, 859 F.2d 255 (2d Cir.1988)). Specifically, the plaintiff argues that the ALJ "made no reference to the testimony of [the plaintiff], other than to state that her 'allegations regarding her complete inability to work are not totally credible for the reasons set forth in the body of the decision.'" (Pl.'s Mem. Supp. Mot., 8/26/03, at 27). However, that statement is just simply not true: the ALJ makes references to the testimony in several parts of his opinion—most notably, in his RFC determination which is quoted above.

In *Williams*, the medical evidence suggested that the claimant was disabled, however the ALJ "failed to make any finding regarding the credibility [of the plaintiffs'] testimony which was uncontradicted and generally consistent with the medical diagnoses." 859 F.2d at 260. Here, the ALJ did not fail to make a credibility determination. He reviewed the record as whole and made his credibility determination in light of that review. The court finds that his determination was set forth with sufficient specificity to permit intelligible plenary review of the record. *See Carroll v. Sec'y of Health & Human Services*, 705 F.2d 638, 643 (2d Cir.1983).

Fourth, the plaintiff argues that, despite his use of an incorrect RFC, the ALJ misstated and misused the vocational evidence under the vocational guidelines. (Pl.'s Mem. Supp. Mot., 8/26/03, at 29). The ALJ found that the plaintiff "has transferable skills from skilled work previously performed." (Tr. 16). The plaintiff contends that the evidence suggests otherwise. The court finds that the ALJ's determination is supported by substantial evidence.

The guidelines require that "[i]n order to find transferability of skills to skilled

sedentary work for individuals who are of advanced age (55 and over), there must be very little, if any, vocational adjustment required in terms of tools, work processes, work setting, or the industry." 20 C.F.R. Pt. 404, App. 2, R. 201.00(f). The vocational expert identified three jobs[5] which "would involve similar tools, work processes, and work settings, and the same or similar industry." (Tr. 15). The plaintiff's argument, in part, is an argument over semantics. Essentially, she contends that the ALJ applied an incorrect standard: that a tool, work process, work setting, or industry is characterized as "similar" does not mean that "very little, if any vocational adjustment" is required. (*See* Pl.'s Mem. Supp. Mot., 8/26/03, at 30–31). The court disagrees; similarity between jobs is exactly what allows for little adjustment between them.

Similarly, the plaintiff argues that because computer training is necessary, and because the jobs would employ different forms and different interviews, they would not afford little, if any, vocational adjustment. Again, similarity does not require identity. What separates this fifth inquiry from the fourth is its consideration of adjustment to "other work." 20 C.F.R. § 404.1520(a)(4)(v). If it were an inquiry into identical work it would collapse into the fourth. Of course differences will exist between the jobs. The question, however, is whether, given the plaintiff's age, educational background, work experience, and RFC, she is able to perform these jobs with little, if any adjustment. Slight adjustments, such as those highlighted by the plaintiff, will not affect this calculus. As such, the court finds the plaintiff's argument unconvincing.

Given the foregoing analysis, the court finds that the ALJ's determination that the plaintiff is not "disabled" within the meaning of 42 U.S.C. § 423(d)(1) is not the result of legal error. Moreover, his findings are consistent with the record and his determination is supported by substantial evidence. As such, the plaintiff's motion for an order reversing the decision of the Commissioner should be **DENIED.**

**B.**

In the alternative, the plaintiff argues that good cause exists for the court to remand the case for a rehearing. However, the plaintiff has failed to show why good cause exists for such a remand. This court, unable to find good cause, declines to do so. As such, the plaintiff's motion for a remand for a rehearing should be DENIED.

**C.**

Having concluded that the ALJ's determination is not the result of legal error and is supported by substantial evidence, the magistrate judge recommends that the defendant's motion for an order affirming the decision of the Commissioner should be GRANTED. The plaintiff may timely seek review of this recommended ruling in accordance with Rule 72(b) of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 72(b). Failure to do so may bar further review. 28 U.S.C. § 636(b)(1)(B); *Small v. Sec'y of Health & Human Services,* 892 F.2d 15, 16 (2d Cir.1989).

**IT IS SO ORDERED.**

March 11, 2004.

---

**5.** As aforementioned, the vocational expert testified that, given her RFC, the plaintiff could work as a loan inspector (Tr. 62–63), as a property insurance information clerk (Tr. 65), and as an insurance checker. (*Id.*).