Juan A. QUILES, Plaintiff

v.

Jo Anne B. BARNHART, Commissioner, Social Security Administration, Defendant

No. CIV.3:02 CV 1224 CFD.

United States District Court, D. Connecticut.

Sept. 29, 2004.

Ann M. Nevins, U.S. Attorney's Office–BPT, Bridgeport, CT, for Social Security Administration, Defendant.

Royal J. Stark, Quinnipiac University School of Law, Health Law Clinic–LA101, Hamden, CT, for Juan Quiles, Plaintiff.

## RULING ON CROSS–MOTIONS FOR JUDGMENT AND REMAND

SMITH, United States Magistrate Judge.

The plaintiff, Juan A. Quiles, brings this appeal under 42 U.S.C. § 405(g) (2000) seeking review of a final decision by the Commissioner of the Social Security Administration ("SSA") denying his application for disability insurance benefits. (Dkt.# 1). The plaintiff has moved for an order reversing the Commissioner's deci-

sion or, in the alternative, for an order remanding his case back to the SSA for further proceedings (Dkt.# 15) and the defendant has moved for an order affirming her decision. (Dkt.# 20). For the reasons stated below, the plaintiff's motion for judgment is **DENIED**; his alternative motion for remand is **GRANTED**. The defendant's motion is **DENIED**. 28 U.S.C. § 636(b)(1)(A). The case is remanded for immediate review.

## I. ADMINISTRATIVE PROCEEDINGS

On December 2, 1999, Mr. Quiles initially applied for supplemental security income ("SSI") benefits. (Tr. 132–34). The SSA denied his application initially on March 29, 2000 (Tr. 90–93) and upon reconsideration on August 4, 2000. (Tr. 96–99). Mr. Quiles appealed this decision and requested a hearing by an administrative law judge ("ALJ"). (Tr. 100). A hearing was held on June 20, 2001 before ALJ Ronald J. Thomas. (Tr. 23–72). Having considered the plaintiff's claim *de novo* the ALJ determined, in a decision dated January 14, 2002, that the plaintiff was not disabled within the Social Security Act (the "Act"). (Tr. 22). Subsequently, on May 18, 2002, the Appeals Council of the SSA denied the claimant's request for review, thereby rendering the ALJ's decision the final decision of the SSA. (Tr. 5–6). As a result, the claimant filed this complaint on July 17, 2002. (Dkt.# 1).

## II. STATEMENT OF FACTS

Mr. Quiles is a forty-five year-old male with a high school equivalency diploma and one year of college who is unable to communicate in English. (*See* Tr. 15, 25). He has not worked since 1998 (*Id.* at 141) and his past relevant work was as a parking lot attendant and a store laborer (*Id.* at 60).

Mr. Quiles alleges several health problems which render him unable to work. He suffers from AIDS, anxiety and depression, hepatitis, thrombocytopenia, and asthma. (Pl.'s Mem. Supp. Mot., 8/11/03, at 3 *citing* Tr. 175, 182, 199, 315, and 319). He also has a history of drug abuse and is a smoker. In addition, Mr. Quiles was treated, just prior to filing his SSI application, for endocarditis. (*Id. citing* Tr. 45, 198–225). A chronology of his medical record is as follows.

Mr. Quiles was initially diagnosed with HIV in 1990. (*See* Tr. 188, 192). He received treatment for his HIV infection in Puerto Rico from 1991 to 1999. (Tr. 145). In 1995 he started ART:AZT, in 1996, he started AZT + 3TC and ddI (for his hepatitis), and in 1997, he started Combivir/Crixivan. (*Id.*). He stopped taking his medicine in 1997. (*Id.*).

He was admitted to Yale New Haven Hospital on September 17, 1999 with "[f]evers, chills, night sweats and productive cough." under the care of Morris Traube, M.D. (Tr. 198, 203). On admission, his "white count was 8, his hematocrit was 20.5, platelet count was 88; sodium 132, potassium 3.9, chloride 103, bicarbonate 22, BUN 10, creatinine of 0.9. His LVH was 162. His PT was 121 his PTT was 26. Total bilirubin 0.37, direct bilirubin 0.17, OT 33, PT 32." (Tr. 200). An outpatient report dated September 17, 1999 indicated that the sodium, calcium, and phosphate-p levels of the plaintiff's blood were "outside the reference range" for normal adults. (Tr. 217). Soon thereafter, on September 21st, Rosemarie L. Fisher, M.D. performed a P.A., lateral films of the chest, and an echocardiogram. (Tr. 212–13). The P.A. and lateral films of the chest showed "[b]ibasilar infiltrates, left greater than right slightly worse and increasing small effusions." (Tr. 212). The echocardiogram showed "[l]arge vegetation on the

atrial side of the tricuspid leaflet and severe tricuspid regurgitation." (Tr. 213). Another P.A. and lateral chest film on September 28 revealed "bilateral modular lesions, as well as pleural effusion present." (Tr. 216). These findings "were suspicious for septic emboli." (*Id.*). Another echocardiogram revealed "a small circumferential pericardial effusion," a "possible ring abscess in the anterolateral portion of the tricuspid valve ring," and a "small rim of fluid in the posterior aspect of the aortic annulus" which "may be consistent with complicated endocarditis." (Tr. 214–15).

The P.A. and lateral chest film were repeated on October 2, 1999 and showed "some clearing of the parenchymal opacity in the left lower lobe." (Tr. 211). Subsequently, a transesophageal echocardiogram was performed on October 6th, which demonstrated an "interval decrease in size of the vegetation." (Tr. 208). The doctor also noted that "[p]arenchymal disease at the left lung base laterally most likely represents subsegmental atelectasis." (*Id.*). A ring abscess was not definitively ruled out. (*Id.*).

On October 7, 2000, the plaintiff underwent two CT scans, one of the abdomen and one of the pelvis. (Tr. 206). They revealed "[r]etroperitoneal adenopathy and distended fluid-filled loops of bowel with wall enhancement which may represent MAI infection" and "[b]ibasilar wedge-shaped densities which may represent septic emboli vs. infiltrate." (*Id.*). Five days later, he underwent a whole body gallium scan which showed "[s]cintigraphic examination with mild diffuse increased uptake in both lung fields consistent with a diffuse inflammatory process, mild." (Tr. 205). On October 15th, he underwent a CT scan of the brain which indicated "[m]inimal cortical volume loss . . . ." (Tr. 204). He

was discharged to return home on November 11th. (Tr. 198).

Mr. Quiles began treatment for his HIV infection at Fair Haven Community Health Clinic, Inc. ("FHCHC") on November 12, 1999, under the care of Martha Buitrago, M.D. and James N. Kirkpatrick, M.D. (*See* Tr. 186–97, 258–78). His problem list included HIV, asthma, substance abuse (heroin/cocaine), thrombocytopenia, HCV, and endocarditis. (Tr. 182, 250). He was prescribed HAART for his HIV infection. (Tr. 192, 260). During this time, Mr. Quiles complained of "episodes of nausea associated [with] morning medications." (Tr. 194, 262). He noted that he "feels tired" and "depressed about having to go to so many" appointments. (Tr. 195, 263). It was around this time that he entered a methadone program at the APT Foundation in New Haven. (Tr. 146).

On December 2, 1999, Dr. Kirkpatrick completed a Medical Report on Adult with Allegation of Human Immunodeficiency Virus (HIV) Infection. (Tr. 223). In that report, he noted no marked restrictions of activities of daily living ("ADLs") and no marked difficulties in maintaining social functioning nor in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. (Tr. 225).

On December 3, 1999, Dr. Buitrago noted that Mr. Quiles was "doing great, feeling better" regarding his HIV infection. (Tr. 196, 264 (noting CD4/V.C. 12/16)). She made similar notations on January 3, 2000. (Tr. 266 *noting* CD4 126–204 and platelets at 30K–142K and that, regarding his HIV infection, Mr. Quiles was "doing great"). She also noted that he was "[t]aking all meds" and that there were "no problems, not skipping meds." (*Id.*).

On January 18, 2000, Steven Paul Edelman, M.D. completed an RFC evaluation. (Tr. 226–33). He noted that Mr. Quiles could occasionally lift and/or carry (includ-

ing upward pulling) twenty pounds, could frequently lift and/or carry (including upward pulling) ten pounds, could stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday, could sit (with normal breaks) for a total of about six hours in an eight-hour work day, and was unlimited in his ability to push and/or pull subject to the aforementioned weight restrictions. (Tr. 227). In addition, Dr. Edelman noted no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. (Tr. 228–30). He did note, however, that the plaintiff's "allegations of symptoms are felt to be fully credible— though relate most likely to recent acute hosp[italization]." (Tr. 231).

On February 2, 2000, Jesus A. Lago completed a report at the behest of Connecticut Disability Determination Services. (Tr. 234–35). He noted that Mr. Quiles "started getting depressed about two months ago" due to the conversion of his diagnosis from HIV to AIDS. (Tr. 234). He noted "no evidence of psychotic thought disorder. No acute suicidal or homicidal thoughts." (Tr. 235). His impression was that Mr. Quiles suffered from depression, not otherwise specified. (*Id.*). He "[r]ule[d] out major depression, mild to moderate in remission." (*Id.*). Dr. Lago noted that "[p]sychiatrically, Mr. Quiles is capable of handling his own affairs." (*Id.*).

On February 9, 2000, Mr. Quiles called FHCHC complaining of "nausea and vomiting all day." (Tr. 271). Two days later, Dr. Buitrago noted that he had "normal LFT's, while on HAART." (*Id.*). Mr. Quiles visited the clinic on February 14th and was given a new regimen of drug treatment. (Tr. 272). He missed several appointments thereafter until May 19th, when he was late "because he was taking [an] exam for work." (Tr. 276). He had

"[f]inished [a] computer course, he was going to work as a clerk … for [the] census." (*Id.*). He had a tender liver, but was "doing well" and "adherent" to his drug regimen. (*Id.*).

On February 17, 2000, Jose R. Santos, M.D. completed an evaluation of Mr. Quiles. (Tr. 240–49). He found that Mr. Quiles had an affective disorder. (Tr. 244). Specifically, he diagnosed him with depression not otherwise specified and noted that it is "improving [with] treatment." (*Id.*). Significantly, Dr. Santos noted that while Mr. Quiles impairment was severe, he did not expect that it would last twelve months. (Tr. 240). On March 28th, a medical consultant agreed with this assessment. (Tr. 238).

On July 17, 2000, Robert G. Sutton, Ph.D. completed an evaluation of Mr. Quiles. (Tr. 282–90). He found that Mr. Quiles had an affective disorder and substance addiction disorders, however he determined that these impairments were not severe. (Tr. 282). Moreover, Dr. Sutton found that Mr. Quiles is not restricted in his activities of daily living, that he has slight difficulties in maintaining social functioning, that he seldom has deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere), and that he never has episodes of deterioration or decompensation in work or work-like settings which cause him to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors). (Tr. 289).

On August 1, 2000, Mr. Quiles returned to FHCHC for follow-up. (Tr. 347–48). On that same date, Derrick Baily, M.D. completed an RFC determination of the plaintiff. (Tr. 291–98). He found that Mr. Quiles could occasionally lift and/or carry (including upward pulling) twenty pounds,

could frequently lift and/or carry (including upward pulling) ten pounds, could stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday, could sit (with normal breaks) for a total of about six hours in an eight-hour work day, and was unlimited in his ability to push and/or pull subject to the aforementioned weight restrictions. (Tr. 292). He also noted that the plaintiff was occasionally limited in his ability to climb ramps, stairs, ladders, ropes, and scaffolds. (Tr. 293). Moreover, he found that the plaintiff had no manipulative, visual, communicative, or unusual environmental limitations. (Tr. 293–95). He conceded that the plaintiffs "[a]llegations of weakness and fatigue [are] credible[,] but not to the point of being totally disabled." (Tr. 296).

On August 8, 2000, Mr. Quiles returned to FHCH complaining of fatigue, difficulty walking, vomiting, and sweating. (Tr. 348–49). He also presented with "high pitched wheezing." (Tr. 349). Six days later, he was noted as having "decreased fatigue and increased energy." (Tr. 351). He still had "mild night sweats which are slowly improving." (*Id.*). He also denied nausea, vomiting, or diarrhea. (*Id.*).

He returned for another follow up on September 12, 2000. Dr. Buitrago again noted that, with regards to his HIV infection, the plaintiff was "doing well, taking all pills." (Tr. 352). However, on October 6th, she noted problems with adherence, nausea, and vomiting. (Tr. 353). Still, he was "doing well, but needs adherence input [with] meds." (*Id.*).

On November 22, 2000, Dr. Buitrago noted that Mr. Quiles "stopped all meds because of severe nausea/vomit." (Tr. 356). She subsequently altered his drug regimen. (*Id.*). However, he refused to follow this regimen as well. (*See* Tr. 358). He missed a January 17, 2001 appointment, but walked in on January 30th complaining of vomiting, SOB, cough, wheezing, fever, and yellow phlegm. (*Id.*). Dr. Buitrago found him to be in mild respiratory distress. (*Id.*). She noted that his retroviruses were in "total chaos" and his medications were not helping. (Tr. 359).

On January 31, 2001, Mr. Quiles met with mental health worker, Carmen Martinez. (Tr. 359). He missed an appointment on February 7th, but on February 9th, Rennee Greene, R.N. received a phone call from Mr. Quiles case manager that he had tried to commit suicide. (Tr. 360). When Ms. Greene spoke with him he "did not seem to be in distress . . . ." (*Id.*).

On that same date, Dr. Buitrago noted that Mr. Quiles was "episodic" and that his respiration was "doing much better." (Tr. 361). She noted that he was "not actively suicidal." (*Id.*). She also noted that he was not on his HIV medications. (*Id.*). He missed another appointment on February 14th, but met with Dr. Claudia Bemis for his mental issues on February 16th. (*See* Tr. 312, 365).

Mr. Quiles returned to FHCHC on February 21, 2001 complaining of vomiting, poor appetite, and controllable suicidal thoughts. (Tr. 365). He was noted as "feeling [his] illness is getting worse." (*Id.*). Still, his anxiety, depression, and sleeplessness had been improving. (*Id.*). He also noted that "taking Bactrim makes me feel better." (Tr. 366).

Mr. Quiles returned for a follow-up visit on February 26th. (Tr. 367). Dr. Buitrago remarked that "we need to start meds! He refuses RTV/NFVCRX because of nausea." (*Id.*). She noted that his depression was improving. Again, on March 16th, Dr. Buitrago noted that he is "not working, staying home all the time." (Tr. 368). At that time, he was "tolerating [his] medication . . . but still [had] nausea." (*Id.*).

On April 3, 2001, Dr. Buitrago, as a treating physician, completed a questionnaire regarding Mr. Quiles' conditions. (Tr. 308–311). She noted that his conditions result in "generalized muscle aches" and that the side effects of his medications cause him difficulties with his activities of daily living. (Tr. 308–09). She also remarked that he was depressed and had "several suicide attempts." (*Id.*). She noted that it was "very difficult to get through the day." (*Id.*). Her prognosis regarding improvement of these conditions was fair. (Tr. 309).

Dr. Buitrago completed an RFC evaluation of Mr. Quiles. (Tr. 311). She found that in an eight-hour workday, Mr. Quiles could only sit, stand, or walk for one hour at a time. (*Id.*). Inconsistent with this assessment, she found that he could sit for one hour total during an entire eight-hour day, but that he could not stand or walk at all. (*Id.*). She stated that the plaintiff could occasionally lift and/or up to five pounds, but never more than that. (*Id.*). She also stated that he could never use either hand for simple grasping, pushing and pulling of arm controls, or fine manipulation. (*Id.*). In addition, she found that he could not use either foot for repetitive movements as in pushing and pulling of leg controls. (*Id.*). While he could occasionally bend, squat, crawl, climb, and reach, Dr. Buitrago found that he was totally restricted from activities involving unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, driving automotive equipment, and exposure to dust, fumes, and gases. (*Id.*).

On May 4, 2001, Mr. Quiles returned to FHCHC for follow-up. (Tr. 372). He was noted as taking all of his medications and only experiencing slight nausea. (*Id.*).

On June 6, 2001, Dr. Bemis noted, in a questionnaire, that Mr. Quiles exhibited poor motivation and initiation of activities because of depression, poor judgment, impaired sleep, energy, and appetite. (Tr. 312). She claimed that this condition causes restrictions in his normal activities. (*Id.*).

Dr. Bemis noted marked limitations in Mr. Quiles' ability to understand, remember, and carry out an extensive variety of technical and/or complex job instructions; ability to understand, remember, and carry out detailed but uncomplicated job instructions; and ability to maintain concentration and attention. (Tr. 314). She also noted moderate limitations in his ability to understand, remember, and carry out simple one- or two-step instructions; ability to interact with supervisors and co-workers; ability to deal with the public; activities of daily living; maintaining social functioning; and that he had deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere). (*Id.*).

On June 15, 2001, Mr. Quiles returned to FHCHC for another follow-up visit. (Tr. 374). He was experiencing less vomiting, only on Trizivir and Dr. Buitrago remarked that he was "doing better" and that his thrombocytopenia was "doing well." (*Id.*). The FHCH entries in the record end at the end of July, 2001. (Tr. 377).

On June 20, 2001, through an interpreter, Mr. Quiles gave testimony before ALJ Thomas with his attorney, Royal Stark, present. (Tr. 25–43). Mr. Quiles complained that he "can't walk much," "can't be standing up all day," and "can't bend and do what I used to be able to do . . . ." (Tr. 31). He had complaints concerning his waist, lungs, and back, but stated that his lungs posed the greatest problems for him. (*Id.*). He has a "deep pain" in his chest that he controls with an albuteral inhaler. (Tr. 32). He also noted that he

has no hobbies and, besides attending his appointments with doctors, stays home and lies down. (Tr. 37).

Mr. Quiles stated that he had to stop working as a parking attendant because he "would feel sick every night because of the AIDS, the virus. I would begin to sweat a lot, and I would get headaches, and I would vomit a great deal." (Tr. 38). He noted that his strength was dropping and he had very little energy. (*Id.*). After leaving his job, he "had the wish to throw myself out the window. I was feeling very bad. I wanted to kill myself." (Tr. 39). However, he admits that he doesn't think about suicide often anymore. (*Id.*).

Mr. Quiles also noted that he no longer cooks; he obtains his meals from the meals on wheels program three times a week. (Tr. 40). He does shop for milk and sugar, but cannot carry them both at the time. (*Id.*). Because he is unable to lift heavy objects, he only buys a half gallon of milk at a time. (*Id.*). He also complains of his inability to walk to the methadone clinic without stopping four or five times "to get some air and get a drink." (Tr. 40–41). He also notes trouble climbing stairs and trouble standing up. (Tr. 41). He also believes that he contracted the HIV virus in jail. (Tr. 42).

Dr. Amy Hopkins, a medical expert, also testified at the hearing. (Tr. 43–56). Her opinion was based on the record which existed at the time which contained FMHCH progress notes through May 19, 2000. (Tr. 45). She noted that in February his CD4 count was 388 which "is not that bad." (Tr. 48). She noted that

> we have no actual AIDS infections documented here, any neurological problems. There's no actual wasting. The diarrhea is just one word listed here but we don't actually have any documentation if he is having diarrhea, how much? How often? Any dehydration resulting from

that? If—all of the normal things you need to determine. The big problem with the physical here is we really have nothing after May 19 of 2000 and certainly nothing that documents any actual AIDS complications.

(Tr. 49). Dr. Hopkins also commented on the lack of objective medical findings contained in the record. (*See* Tr. 49–50).

Dr. Hopkins acknowledged two listed impairments that the plaintiff might satisfy: the HIV listing (14.08) and the "N" listing (10.04). (Tr. 51). Regarding his HIV infection, Dr. Hopkins remarked that "it doesn't rise to the level of listing. No neurologic abnormalities have been documented. No HIV wasting syndrome was documented. Diarrhea has specific requirements and they are not met by just the word diarrhea in the record." (Tr. 51). Dr. Hopkins was "not quite sure how [the N listing] is met or not met .... [as][i]t's a rather vague one." (*Id.*). Regarding the HIV listing, she noted that

> [i]mportant factors to be considered in evaluating the functioning of individuals of the HIV infection include but are not limited to symptoms such as fatigue and pain, characteristics of the illness, such as the frequency and duration of manifestations or exacerbation and remission in the disease course, and the functional impact of treatment for the disease, including the side effects of medications.

(Tr. 54).

Ronald Friedman, a vocational expert ("VE"), also provided testimony. (Tr. 57–67). He submitted that an individual of Mr. Quiles' "age, education, and past relevant work experience who is limited to performing work in the following manner; that the individual has an inability of maintaining competitive pace within an average eight hour workday due to fatigue and weakness and lack of concentration and

other factors" could not perform his past work or any other work locally or nationally. (Tr. 60–61). He also opined that an individual of Mr. Quiles' "age, education, [and] past relevant work experience who is limited to performing sedentary work as defined in the regulations and has the further restrictions of the need of a low stress environment which is supervised, requires few decisions ... [with] the need for an environment free from poor ventilation, dust, fumes, gasses, odors, humidity, wetness, and temperature extremes" could work as a production inspector checker (100 locally, 2–3,000 nationally) and laboring jobs (100 locally, 8–10,000 nationally). (Tr. 61–62).

## III. STANDARD OF REVIEW

In reviewing a decision of the [Commissioner] under § 405(g), the district court performs an appellate function. *Zambrana v. Califano,* 651 F.2d 842, 844 (2d Cir. 1981); *Igonia v. Califano,* 568 F.2d 1383, 1387 (D.C.Cir.1977). A reviewing court will "set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir. 1998). *See also Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990) ("As a general matter, when we review a decision denying benefits under the Act, we must regard the [Commissioner's] factual determinations as conclusive unless they are unsupported by substantial evidence") (citations omitted). "Substantial evidence" is less than a preponderance, but "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). *See Yancey v. Apfel,* 145 F.3d 106, 110 (2d

Cir.1998); *Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988).

In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). *See also State of New York v. Sec'y of Health and Human Servs.,* 903 F.2d 122, 126 (2d Cir. 1990) (stating that the court, in assessing whether the evidence which supports the Commissioner's position, is required to "review the record as a whole") (citations omitted). Moreover, the standard should be applied in light of the fact that the Act "is a remedial statute, to be broadly construed and liberally applied." *Gold v. Sec'y of Health Educ. & Welfare,* 463 F.2d 38, 41 (2d Cir.1972) (citations omitted).

The regulations promulgated by the Commissioner establish a five-step analysis for evaluating disability claims. *Bowen v. Yuckert,* 482 U.S. 137, 140–142, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); 20 C.F.R. § 404.1520 (2004). First, the Commissioner considers if the claimant is presently working in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(I). If not, the Commissioner next considers if the claimant has a medically severe impairment. *Id.* § 404.1520(a)(4)(ii). If the severity requirement is met, the third inquiry is whether the impairment is listed in Appendix 1 of the regulations or is equal to a listed impairment. *Id.* §§ 404.1520(a)(4)(iii); Pt. 404, Subpt. P.App. 1. If so, the disability is granted. If not, the fourth inquiry is to determine whether, despite the severe impairment, the claimant's residual functional capacity allows him or her to perform any past work. *Id.* § 404.1520(a)(4)(iv). If a claimant demonstrates that no past work can be performed, it then becomes incumbent upon the Commissioner to come forward

with evidence that substantial gainful alternative employment exists which the claimant has the residual functional capacity to perform. *Id.* § 404.1520(a)(4)(v). If the Commissioner fails to come forward with such evidence, the claimant is entitled to disability benefits. *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990); *Berry,* 675 F.2d at 467.

While the claimant bears the burden of proving the first four steps, the Commissioner must prove the final one. *Berry,* 675 F.2d at 467. Thus, if the claimant is successful in showing that she is unable to continue his past relevant work, "the [Commissioner] then has the burden of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986).

## IV. DISCUSSION

■ First, the plaintiff argues that substantial evidence exists to support a determination that the plaintiff was disabled at the time of the ALJ hearing, and had been so since his December 1999 application for SSI. (Pl.'s Mem. Supp. Mot., 8/11/03, at 10). This argument is misplaced. The appropriate standard by which the court reviews final decisions of the SSA is whether the *ALJ's determination* is supported by substantial evidence. *See Balsamo,* 142 F.3d at 79. Whether substantial evidence exists to support a determination that the plaintiff was disabled is of no import to the court's determination.

After careful review of the record, the court finds that the ALJ's decision is supported by substantial evidence to the extent that the ALJ followed the sequential steps for analyzing a claim. The ALJ has found that "the objective medical evidence fails to document any significant clinical findings or opportunistic infections associated with [his HIV infection], which is inconsistent with his claims of complete ability to work" and that "since his hospitalization, treatment notes fail to document significant HIV related illness, especially once he began taking his medication as prescribed." (Tr. 16). Indeed, the record contains a moderate amount of objective medical evidence regarding Mr. Quiles' HIV infection, none of which suggests the presence of any opportunistic infections. (Tr. 49–50). Moreover, adherence to his drug regimen, significantly alleviated his symptoms. (Tr. 266, 276, 352, 366, 372). In addition, while Mr. Quiles experiences side effects from his drug regimen, and they are severe, there is no evidence that they preclude him from performing any job.

To that end, Dr. Kirkpatrick noted no marked restrictions in ADL's, no marked difficulties in maintaining social functioning nor in completing tasks in a timely manner. (Tr. 255). Drs. Edelman and Baily found that Mr. Quiles could occasionally lift and/or carry twenty pounds, could frequently lift and/or carry ten pounds, could stand and/or walk for a total of about six hours in an eight-hour workday, could sit for a total of about six hours in an eight-hour workday, and was unlimited in his ability to push and/or pull subject to the aforementioned weight restrictions. (Tr. 227, 292). Indeed, Mr. Quiles was late to an appointment at FHCHC "because he was taking [an] exam for work." (Tr. 276). He had "[f]inished [a] computer course, he was going to work as a clerk ...for [the] census." (*Id.*). In addition, Drs. Lago, Santos, and Sutton found that Mr. Quiles' psychiatric health did not preclude him from working. (Tr. 234–5, 240–49, 282–90). While the court sincerely sympathizes with Mr. Quiles, and agrees with the ALJ and the host of doctors who have

determined that his condition is, in fact, severe, it finds that ALJ's determination that Mr. Quiles' condition is not so severe as to preclude him from working is supported by substantial evidence.

■ Second, the plaintiff argues that the ALJ has erred in making his credibility determination. (Pl.'s Mem. Supp. Mot., 8/11/03, at 11). Social Security Ruling ("SSR") 96–7p provides ALJs with five guiding principles in assessing the credibility of an individual's statements. SSR 96–7p. The plaintiff contends that the ALJ's handling of his subjective complaints was conclusory at best, failing to "state with specificity what parts of the testimony were credible, and what were not." (Pl.'s Mem. Supp. Mot., 8/11/03, at 12). Again, the plaintiff's argument misses the mark.

It is clear from his opinion that the ALJ has found Mr. Quiles' subjective complaints about the nature of his conditions to be credible. To reiterate, neither the ALJ nor this court doubts that Mr. Quiles' conditions are severe and that he experiences pain and discomfort. However, the ALJ has found that Mr. Quiles' conditions were not so severe *as to preclude him from working.* Thus, to the extent that Mr. Quiles testified that he was unable to work, the ALJ has properly discredited his testimony. To emphasize the clarity of this point, the entire paragraph of the ALJ's opinion concerning Mr. Quiles' subjective complaints is reproduced in its entirety below:

> In reaching this residual functional capacity assessment, the claimant's subjective complaints must be considered as contained in his testimony and supporting documentation (20 CFR 416.929 and SSR 96–7p). However, the claimant's statements in this regard are inconsistent with the objective medical evidence and other substantial evidence of record. [The objective evidence and other sub-

stantial evidence of record had already been set forth in the preceding four pages]. *The [claimant] testified that he is unable to work* due to inability to stand or walk for prolonged periods because of shortness of breath and fatigue. He also reported difficulty sleeping, memory difficulties and inability to focus. He was very vague as to his activities of daily living. He stated he does nothing, but stay at home and rest. He further testified that he has been off drugs for 2–3 years. However, these statements are inconsistent with findings in the record. The record indicates that he began treatment for drug use in November 1999. The record further indicates that relapse[d] in February 2000. *The claimant's physical and mental limitations do not warrant a finding of complete functional incapacity.* Despite the claimant's HIV infection, the record indicates that his condition is relatively stable with treatment. There is no evidence of opportunistic infection and depression, or other HIV related illness. Overall, the record noted that his HIV infection and depression, as well as his asthma and ITP were stable and that he was doing well. There is evidence of side effects from the medication, including nausea and vomiting. However, in May 2001, he noted only "a little" nausea, but no other side effects. The relative stability of his overall condition is reflected in his ability to engage in significant activities and attend to his personal needs. For example, he testified and reported that he took a computer course in April 2000 and completed the course. Significantly, he noted that he was going to work as a clerk for the census. He also reported that he took the examination for a job with the phone company (SNET), but did not pass the test. In [ ] December 1999, the claimant reported that he could walk 5 blocks; he

had problems paying attention or finishing what he started; could understand instructions and had no problems remembering. He reported that he could perform activities, such as, cooking,[1] cleaning, shopping, and reading. He also attends meetings, including AA. These activities demonstrate his physical and mental capability to perform routine tasks and get along with others. Significantly, his ability to complete a computer course demonstrates greater mental capacity than alleged. He reported improvement in his symptoms with medication, including improved sleep and asthma. No side effects were noted with his other medications (except HIV medications). Therefore, it is found that the claimant's subjective complaints *of complete functional incapacity* are not credible.

(Tr. 19)(emphasis added) (citations omitted).

Undoubtedly, the ALJ's assessment of the credibility of the plaintiff's statements were made in accordance with SSR 96–7p. Section 2 of SSR 96–7p requires that the ALJ "make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." S.S.R. 96–7p(2). The ALJ has discredited Mr. Quiles' statements about the functional effects of his symptoms based on the objective evidence contained in the record. His decision in this regard is not a "single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible" as prohibited by section 5 of SSR 96–7p. S.S.R. 96–7p(5). To the contrary, the ALJ's credibility determination considers the record as whole, as illustrated in the

paragraph reproduced above, and in the prior four pages of his opinion. That said, the plaintiff must bear in mind that the ALJ is not required to "reconcile every conflicting shred of medical testimony." *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.1981). As he cites in his brief, a finding that the witness's testimony is not credible need only be set forth with sufficient specificity to permit intelligible plenary review. *Williams v. Bowen,* 859 F.2d 255, 260–61 (2d Cir.1988). For the aforementioned reasons, the court finds that the ALJ met this burden.

■ Third, the plaintiff argues that the ALJ has erred in his assessment of the treating physicians' reports. (Pl.'s Mem. Supp. Mot., 8/11/03, at 13). Specifically, he contends that the ALJ has erroneously found the opinions of Drs. Buitrago and Bemis to be inconsistent with other substantial evidence in the record, and therefore not entitled to controlling weight as the opinions of treating physicians. (*Id. citing* Tr. 18). The court disagrees.

■ A treating physician's opinion is entitled to controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 416.927(d)(2) (2004). As aforementioned, Dr. Buitrago posited that Mr. Quiles could only sit, stand, or walk for one hour at a time. (Tr. 311). Perplexingly, in the same RFC evaluation she found that while he could sit for a total of one hour, he could not stand or walk at all. (*Id.*). She also found that Mr. Quiles could never use either hand for simple

---

1. The plaintiff makes much of the fact that he testified that he does not cook and that he has his meals delivered by the Meals on Wheels program. (Pl.'s Mem. Supp. Mot., 8/11/03, at 13). While the ALJ may have erred in reading the record regarding this fact or committed a typographical error, this factor is but a minuscule piece of his assessment and not worthy of much weight.

grasping, pushing and pulling of arm controls, or fine manipulation. (*Id.*). Moreover, she found that he could not use either foot for repetitive movements as in pushing and pulling of leg controls. (*Id.*).

Besides being inconsistent with the other doctors of record as elucidated above (Drs. Kirkpatrick, Edelman, Lago, Santos, Sutton, and Baily), these findings are inconsistent with Dr. Buitrago's own progress notes. For example, she periodically refers to Mr. Quiles as "doing well" or "doing great!" (*See e.g.*, Tr. 196, 264, 276, 337, 346, 352–53, 374). Moreover, her handwritten notes indicate that he was late for an appointment "because he taking exam for work SNET; finished computer course, he is going to work as a clerk and for census." (Tr. 276). The court is baffled how someone with no fine manipulation abilities could complete a computer course. The court is also at a loss to reconcile the fact that someone who cannot stand or walk could physically attend the course. The court disagrees with the plaintiff that Dr. Buitrago's RFC evaluation is fully consistent with her progress notes and the opinions of the other doctors of record. Instead, the court finds that the ALJ has properly discounted her opinion. It is not entitled to controlling weight, and the ALJ has adequately explained how her opinion is undercut by other substantial evidence in the record. *See Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Accordingly, the court finds that the ALJ did not substitute his own judgment for competent medical opinion, as the plaintiff alleges. (Pl.'s Mem. Supp. Mot., 8/11/03, 14–15) *citing McBrayer v. Sec. of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir.1983).

█ Fourth, the plaintiff argues that the ALJ has erred in using the medical-vocational guidelines (the "Grid") as a framework for determining that the plain-

tiff was not disabled. (Pl.'s Mem. Supp. Mot., 8/11/04, at 15). The Grid is "predicated on an individual's impairment which manifests itself by limitations in meeting the strength requirements of jobs . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2) (2004). As such, the Grid "may not be fully applicable where the nature of an individual's impairment does not result in such limitations, e.g., certain mental, sensory, or skin impairments." *Id.* Where a claim involves both exertional and nonexertional limitations, the Grid may be used to find that the claimant is disabled, but it may not be relied on exclusively to find that the claimant is not disabled. *See id.*; Smith & Fahey, Esquire, *Some Points on Litigating Title II and Title XVI Social Security Disability Claims in United States District Court*, 14 Quinnipiac L.Rev. 243, 264 (1994).

The plaintiff cites *Pratts v. Chater*, 94 F.3d 34, 38–39 (2d Cir.1996) for the proposition that the ALJ "needed to make a definitive statement about whether the plaintiff's ability to perform the full range of sedentary work was or was not significantly diminished by environmental and mental nonexertional impairments." (Pl.'s Mem. Supp. Mot., 8/11/03, at 15). Of course, that case is clearly distinguishable. In *Pratts*, the Court of Appeals noted that the "ALJ found that the grids directed a conclusion that Pratts was not disabled even though *she neither identified his nonexertional limitations nor considered whether a vocational expert was necessary.*" 94 F.3d at 39 (emphasis added). The Second Circuit based its decision in this regard on *Bapp v. Bowen*, 802 F.2d 601 (2d Cir.1986) in which it held that when a claimant's nonexertional impairments significantly diminish his ability to work, "the [Commissioner] must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in

the economy which claimant can obtain or perform." *Id.* at 603. Here, the ALJ has admitted that Mr. Quiles suffers from non-exertional impairments which diminish his ability to work. He has discussed at length the substance of these nonexertional impairments throughout his opinion. (Tr. 16–17 (noting nausea, memory loss, anxiety/depression, poor motivation with inhibition of activities secondary to depression, poor judgment, chest pain, shortness of breath, impaired sleep, limitations in understanding, remembering and carrying out complex and detailed job instructions, moderate limitations in two-step instructions, to name a few)). Moreover, while he has noted that the Grid formed "a framework for decision-making in this case" (Tr. 22), he has also introduced the testimony of VE Friedman that jobs exist in the economy which Mr. Quiles can obtain or perform (Tr. 57–72). As such, the court finds the plaintiff's argument in this regard to be unpersuasive.

■ Fifth, the plaintiff argues that the ALJ's finding that there is a significant number of jobs in the national economy that the plaintiff could perform is unsupported by substantial evidence, and inconsistent with other statements in the decision. (Pl.'s Mem. Supp. Mot., 8/11/03, at 16). The court must agree with the plaintiff in this limited regard.

In his opinion, the ALJ "concluded that the claimant's combination of impairments limits him to sedentary exertion with mild limitations in activities of daily [living], mild difficulty maintaining social functioning, moderate difficulty maintaining concentration, persistence or pace and no episodes of deterioration in work or work-like settings ("B" criteria) secondary [to] de-

pression." (Tr. 18). Accordingly, he determined that Mr. Quiles retains the RFC to "lift up to 10 pounds occasionally, sit up to 6 hours and stand/walk up to 2 hours in an 8–hour workday with work involving a supervised, low stress environment (defined as requiring few decisions) and an environment free from poor ventilation, dust, fumes, gases, odors, humidity, wetness and temperature extremes." (*Id.*).

As is the common practice, the ALJ questioned the VE by means of hypotheticals. He asked the VE to "take an individual of the Claimant's age, education, and past relevant work experience who is limited to performing work in the following manner; that the individual has an inability of maintaining competitive pace within an average eight hour workday due to fatigue and weakness and lack of concentration and other factors." (Tr. 60). The VE testified that such an individual would be incapable of performing his past work and that no jobs existed locally nor nationally for such an individual. (Tr. 60–61).

The ALJ continued with a second hypothetical:

> take an individual the Claimant's age, education, past relevant work experience who is limited to performing sedentary work as defined in the regulations and has the further restrictions of the need for a low stress environment which is supervised, requires few decisions. And further, the need for an environment free from poor ventilation, dust, fumes, gasses, odors, humidity, wetness, and temperature extremes.

(Tr. 61). The VE testified that jobs existed which such an individual could perform.[2] (*Id.*).

2. The VE testified:
We would probably look at jobs in the assembly area under the [INAUDIBLE] code of 785. And factoring in a—the variable of

poor ventilation, I would probably reduce the number, which as of December 2000 was 1,199 for the State of Connecticut. I would reduce that down to probably about

The court is not convinced that the ALJ has met his burden of establishing that jobs exist which the plaintiff is capable of performing. Neither of the ALJ's hypotheticals accurately represent Mr. Quiles. In fact, the ALJ's description of Mr. Quiles' RFC falls squarely in between the two hypotheticals. Mr. Quiles is not *inter alia unable* to maintain competitive pace, but he does have *moderate difficulty* in maintaining competitive pace. (*Compare* Tr. 60 *with* Tr. 18).[3] Moreover, the second hypothetical does not take into consideration several of the ALJ's own observations: namely, Mr. Quiles' "mild limitations in activities of daily [living], mild difficulty maintaining social functioning, moderate difficulty maintaining concentration, persistence or pace ..." (Tr. 18). In addition, when asked by plaintiff's counsel whether "a person able to do medium level exertional work [a level higher than that which the ALJ has found applied to Mr. Quiles] with a moderate impairment in the ability to maintain concentration and attention, who has the same age, education, and past relevant work as the Claimant," the VE testified that such an individual could not perform any other jobs. (Tr. 67). As such, the court finds that the ALJ cannot rely on the VE's testimony to establish that alternative employment exists which Mr. Quiles is capable of performing.

That said, the court is far from convinced that the plaintiff is entitled to the payment of benefits. In fact, the court believes that the medical evidence on record militates against such a finding. As such, to the extent that the plaintiff moves for an order reversing the decision of the Commissioner and ordering immediate payment of benefits, his motion is **DENIED**. However, given that the ALJ did not meet his burden of demonstrating that the plaintiff is capable of performing other work, the plaintiff's motion for an order remanding his case back to the Commissioner for further proceedings pursuant to 42 U.S.C. § 405(g) is **GRANTED**. The court hereby ORDERS that the case be remanded. Accordingly, the defendant's motion for an order affirming the decision of the Commissioner is **DENIED**.

The defendant may timely seek review of this recommended ruling in accordance with Rule 72(b) of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 72(b).

---

2 or 300 at least that would be done in environments clean enough to meet that criteria. That same classification nationally would show for a total of 104, 000 total at the sedentary rate. So we will drop that— probably you would find at least 40 to 50,-000 performed in environments where the ventilation would not an issue for the person. Then we would get into jobs where somebody is working as a production inspector checker. It would be the unskilled range and sedentary. Nationally we see that to be about a total of 14,500 and factoring in the need for a clean environment, I would think we could say at least safely there would be 2 to 3,000 nationally for that. And locally we can—under that classification there are only around 200 at the sedentary rate, so probably defiantly less than 100 are coming in at the clean environment range on that. And finally we look at a variety of laboring jobs. These are outside of construction, they're considered. And that would be, at the sedentary rate, statewide, around 450 and I think I would probably say 100 of these could be done in a cleaner environment or a clean enough environment. And nationally those are around 66,483 at the sedentary total and I think we could safely say, you know, 8 to 10,000 could be found within a clean environment.
(Tr. 61–62).

3. Of course, the court recognizes that this hypothetical is largely irrelevant to this discussion as it prejudices only the defendant: given that the VE determined that such an individual would be incapable of performing any work, it could serve only to bolster the plaintiff's claim of the same. The court references it solely as a comparison.

Failure to do so may bar further review. 28 U.S.C. § 636(b)(1)(B); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989).

**IT IS SO ORDERED.**